IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

**CHRISTOPHER J. FOX, KAREN FOX AND**
**MIKAILA FOX, HALEY FOX, CHRISTOPHER M.**
**FOX, TRISTAN FOX, AND EASTON FOX,**
**MINORS, BY AND THROUGH THEIR NATURAL**
**GUARDIANS, CHRISTOPHER J. FOX AND KAREN FOX**          **PLAINTIFFS**

**VERSUS**                                    CAUSE NO. A2402-2017-1103

**HUNT SOUTHERN GROUP, LLC FKA**
**FOREST CITY SOUTHERN GROUP, LLC,**
**FOREST CITY RESIDENTIAL MANAGEMENT, LLC,**
**HUNT MH PROPERTY MANAGEMENT, LLC,**
**UNKNOWN JOHN AND JANE DOES A THROUGH M, AND**
**OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z**          **DEFENDANTS**

### SUMMONS

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

TO:   **Hunt Southern Group, LLC fka Forest City Southern Group, LLC**
      **c/o Registered Agent**
      **Capitol Corporate Services, Inc.**
      **248 E. Capitol Street, Suite 840**
      **Jackson, Mississippi 39201**
      **OR WHEREEVER THEY MAY BE FOUND**

### NOTICE TO DEFENDANT(S)

**THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU**
**MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.**

You are required to mail or hand-deliver a copy of a written response to the Complaint to **Rushing**
**& Guice, P. L. L. C.,** the attorneys for Plaintiffs, whose address is **Post Office Box 1925, Biloxi,**
**Mississippi 39533-1925** and whose street address is **1000 Government Street, Suite E, 2nd Floor, Ocean**
**Springs, Mississippi 39564**.   Your response must be mailed or delivered within thirty (30) days from the
date of delivery of this Summons and Complaint or a Judgment by default will be entered against you for
the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable
time afterward.

Issued under my hand and the seal of said Court, on this the 22 day of Dec. , 2017.



Connie Ladner   Clerk

BY: _____   D.C.



EXHIBIT

A

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

CHRISTOPHER J. FOX, KAREN FOX AND
MIKAILA FOX, HALEY FOX, CHRISTOPHER M.
FOX, TRISTAN FOX, AND EASTON FOX,
MINORS, BY AND THROUGH THEIR NATURAL
GUARDIANS, CHRISTOPHER J. FOX AND KAREN FOX          **PLAINTIFFS**

**VERSUS**                                    CAUSE NO. A2402-2017-1103

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z          **DEFENDANTS**

## COMPLAINT

### JURY TRIAL REQUESTED

COME NOW Plaintiffs, Christopher J. Fox, Karen Fox, and Mikaila Fox, Haley Fox,

Christopher M. Fox, Tristan Fox, and Easton Fox, Minors, by and through their natural

guardians, Christopher J. Fox and Karen Fox (Plaintiffs), by and through their attorneys, Rushing

& Guice, P.L.L.C., and file this their Complaint against Hunt Southern Group, LLC fka Forest

City Southern Group, LLC, Forest City Residential Management, LLC, Hunt MH Property

Management, LLC, Unknown John and Jane Does A through M, and Other Unknown Corporate

Entities N through Z (Defendants), and for good cause of action, states unto the Court the

following, to-wit:



FILED

DEC 22 2017

CONNIE LADNER
CIRCUIT CLERK

BY: _____ D.C.

## PARTIES

1.

Plaintiff, Christopher J. Fox ("Christopher J."), is an adult citizen of Jackson County, Mississippi residing at 125 Brackish Place, Ocean Springs, Mississippi.

2.

Plaintiff, Karen Fox ("Karen"), is an adult citizen of Jackson County, Mississippi residing at 125 Brackish Place, Ocean Springs, Mississippi.

3.

Plaintiff, Mikaila Fox ("Mikaila"), is the minor child of Christopher and Karen, her natural guardians, born August 15, 2001, and is a resident of the State of Mississippi, residing at 125 Brackish Place, Ocean Springs, Mississippi.

4.

Plaintiff, Haley Fox ("Haley"), is the minor child of Christopher and Karen, her natural guardians, born December 23, 2002, and is a resident of the State of Mississippi, residing at 125 Brackish Place, Ocean Springs, Mississippi.

5.

Plaintiff, Christopher M. Fox ("Christopher M."), is the minor child of Christopher and Karen, his natural guardians, born September 28, 2005, and is a resident of the State of Mississippi, residing at 125 Brackish Place, Ocean Springs, Mississippi.

6.

Plaintiff, Tristan Fox ("Tristan"), is the minor child of Christopher and Karen, his natural guardians, born November 15, 2007, and is a resident of the State of Mississippi, residing at 125 Brackish Place, Ocean Springs, Mississippi.

7.

Plaintiff, Easton Fox ("Easton"), is the minor child of Christopher and Karen, his natural guardians, born June 26, 2010, and is a resident of the State of Mississippi, residing at 125 Brackish Place, Ocean Springs, Mississippi.

8.

Defendant, Hunt Southern Group, LLC (Hunt Southern), formerly known as Forest City Southern Group, LLC (Forest City Southern) is a Delaware Limited Liability Company registered to do business in Mississippi. On March 18, 2016, Forest City Southern Group, LLC filed Articles/Certificate of Amendment with the Mississippi Secretary of State, changing its name to Hunt Southern Group, LLC. Hunt Southern fka Forest City Southern may be served through it registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Hunt Southern fka Forest City Southern is believed to be the owner of the property in issue.

9.

Defendant, Forest City Residential Management, LLC (Forest City Residential Management), is an Ohio Limited Liability Company, formally known as Forest City Residential Management, Inc., whose registration in Mississippi was administratively dissolved on November 30, 2016. Forest City Residential Management may be served with process by serving its registered agent for process, FCE Statutory Agent, Inc., 50 Public Square, Suite 1360, Cleveland, Ohio 44113. Forest City Residential Management is listed as the agent for Forest City Southern Group on the lease for the property in issue.

10.

Defendant, Hunt MH Property Management, LLC (Hunt MH Property Management), is a Delaware Limited Liability Company, registered to do business in Mississippi and may be served through its registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Based on information and belief, Hunt MH Property Management is the agent of Hunt Southern and has been charged with the maintenance and upkeep of the property in issue.

11.

Other Unknown John and Jane Does A through M are unknown Defendants who may be seasonably supplemented after discovery.

12.

Other Unknown Corporate Entities N through Z are unknown Defendants who may be seasonably supplemented after discovery.

## JURISDICTION AND VENUE

13.

Jurisdiction is proper in this Court under Miss. Code Ann. § 9-7-81. Venue is proper in Harrison County as this is the location where the injuries were sustained, where the cause of action accrued and where Plaintiffs resided. Jurisdiction is also proper pursuant to Miss. Code Ann. § 13-3-57 since Defendants were doing business within the State, made contracts with Plaintiffs, who are residents of Mississippi, those contracts were performed wholly within Harrison County, Mississippi, Second Judicial District, and the alleged tort was committed against Plaintiffs in Mississippi. Defendants, therefore, should be subjected to the jurisdiction of Mississippi courts.

## FACTS

### 14.

Christopher J. is a Lieutenant with the United States Navy. In August of 2014 Christopher J. moved his family to Biloxi, Mississippi as part of a routine change of station. Like other military families moving to the area, the military housing assignment for Plaintiffs was controlled by Defendant Hunt Southern fka Forest City Southern.

### 15.

On or about August 1, 2014 Plaintiffs entered into a Military Lease Agreement for military housing in the Bayridge Neighborhood located at 406 Billy Mitchell Circle in Biloxi, Mississippi in the County of Harrison (Subject Property). Plaintiffs moved into the Subject Property in September of 2014. The Subject Property is located in the Bayridge Neighborhood, an exclusive Officers and Senior enlisted Community. Bayridge is comprised of 330 homes and is located on Keesler Air Force Base. At all times mentioned herein, Plaintiffs' home was owned, controlled or managed by one of Defendants.

### 16.

At the time Plaintiffs entered into the Military Lease Agreement, Bayridge was owned and operated by Forest City Southern and managed through Forest City Residential Management. In 2016, Bayridge was acquired by Hunt Southern and operated or managed through Hunt MH Property Management. Upon information and belief Forest City Southern and Hunt Southern exercised custody and control over Bayridge and acted as the owners of Bayridge through a fifty year lease initiated by the United States Department of Defense through a program called the Military Housing Privatization Initiative. Essentially, while Defendants own

the improvements on the land and maintain custody and control of the property, the United States maintains an ownership interest in the land.

17.

While residing in the Subject Property, Plaintiffs repeatedly reported maintenance concerns involving mold and water damage. Despite Defendants' maintenance technicians reporting that the mold and leaks were resolved, it was learned that the air conditioner ductwork had a sweating problem and that the mold problem was more pervasive. This duct sweating, caused by poorly insulated ductwork, contributed to the mold and water damage throughout the house. Further it has been recently shown that Defendants have taken significant steps to replace the ductwork in many of the houses they operate.

18.

Plaintiffs' repeatedly requested that Defendants address mold and leaking problems while residing in the Subject Property. Rather than removing the mold, Defendants cleaned the mold with "soap and water." Fraudulent misrepresentations were made to Plaintiffs by Defendants regarding the removal of the mold. Plaintiffs were told that the mold problem had been rectified when in fact the cause of the water damage was not addressed. Throughout the entire time Plaintiffs resided in the Subject Property, Defendants never replaced the air conditioner filters. Plaintiffs replaced the filters on their own.

19.

Rather than addressing the cause of the leaks, Defendants' maintenance technicians cleaned the mold with soap and water. This allowed for the toxic mold to continue flourishing beneath the surface. Although Defendants learned that condensation was coming from attic ductwork, nothing was done to repair the moisture problem.

20.

On October 13, 2017, testing was performed on the Subject Property with Teddy Bear Restoration. Teddy Bear performed a Spore Trap Analysis and tested both outside and inside the Subject Property for mold spores. The reports showed high levels of Aspergillus inside the Subject Property with less being found outside the Subject Property. These elevated levels of toxic mold are well-known for causing serious health concerns. See Teddy Bear Restoration Mold Report attached hereto as **Exhibit "A."**

21.

Plaintiffs have obtained information from other military housing families leading them to believe that mold issues such as those experienced in their home were commonplace, having occurred in other military housing owned and operated by Defendants including others in Bayridge.

22.

As a direct result of the continued exposure to toxic mold located in Plaintiffs' home, all of which was known to Defendants, Plaintiffs have suffered and continue to suffer physical injuries, medical expenses and property damage.

23.

The Subject Property is a water damaged building, a residential structure which has been subject to excessive water intrusion from both external and internal water leaks and moisture accumulation. The term "water damaged building" is also used in conjunction with a descriptive term now used by the National Academies of Science, the U.S. Centers for Disease Control, and the World Health Organization, i.e., "damp indoor spaces" and "mold related illness," all of which collectively describe a mixture of biologically generated contaminates known to cause

adverse human health effects. Damp Indoor Spaces are now recognized by multiple federal and medical authorities as a public-health problem, contributing to tens of thousands of illnesses across the country and billions of dollars in medical costs.

24.

In this case, Plaintiffs had a certified mold investigator identify excessive mold growth and moisture inside the house, typical of a damp indoor space, both by sampling and visual observation. Aspergillus, known to be a powerful respiratory irritant, was found in the home during the air test. This spore is particularly dangerous, as it is well known to grow in excessive numbers in damp indoor spaces and to release mycotoxins and VOCs, and have toxic impacts of its own. The tests exceeded all bounds of sampling error and demonstrate the extremely dangerous conditions Plaintiffs are forced to live in.

25.

Defendants, as large, national managers and owners of thousands of apartment and residential units knew full well of the health risks associated with water damaged buildings and mold. Defendants failed to remediate mold in the Subject Property and caused serious injury and property loss to Plaintiffs as a result.

**COUNT I**

**NEGLIGENCE**

26.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 25.

27.

Defendants, as owners and/or managers of Bayridge:

A.  Failed to provide a reasonably safe premises in accordance with the Military Lease Agreement, which amounted to a breach of the implied warranty of habitability;

B.  Negligently failed to pay for relocation expenses;

C.  Failed to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by Plaintiffs;

D.  Negligently failed to maintain the air conditioning system and ducts in such a way allowing ideal conditions for toxic mold to grow in the Plaintiffs' house, including never replacing the air conditioner filters;

E.  Negligently managed and maintained Bayridge;

F.  Negligently supervised their employees, agents and/or representatives;

G.  Negligently trained and supervised their employees, agents and/or representatives;

H.  Negligently inspected Bayridge for dangerous and harmful conditions;

I.  Negligently remediated the toxic mold contained in the Subject Property;

J.  Knew or should have known that the house contained dangerous levels of toxic mold and did nothing to remedy the toxic mold infestation;

K.  Failed to exercise reasonable care to repair dangerous defective conditions, which included the existence of mass amounts of toxic mold in the Subject Property, upon notice of their existence by Plaintiffs;

L.  Negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold; and

M.    Failed to prevent any and all other acts of negligence which may be proven at trial by failing to fulfill its duties to Plaintiffs, thus causing damages which they have suffered.

28.

As a direct and proximate result of the negligence of Defendants, Plaintiffs sustained serious and painful personal injuries, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT II

## GROSS NEGLIGENCE

29.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 28.

30.

At all times mentioned herein, Defendants acted with gross negligence in total disregard of the duties owed to Plaintiffs to the degree that said gross negligence constitutes an intentional act.

31.

As a direct and proximate result of the gross negligence of Defendants, Plaintiffs have suffered injuries as described herein.

## COUNT III

## BREACH OF CONTRACT

32.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 31.

33.

Defendants breached the Military Lease Agreement entered into with Plaintiffs on August 1, 2014. The contract was breached for the following reasons:

A. Defendants violated the Implied Covenant of Good Faith and Fair Dealing when they failed to deal fairly and in good faith causing Plaintiffs to not benefit from the contract;

B. Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they leased to Plaintiffs a house that was not fit for human habitation;

C. The negligent management and maintenance of the property led to the moist environment, which is ideal for toxic mold growth;

D. Defendants failed to successfully complete the annual physical maintenance inspection of the property to ensure the house was up to housing maintenance quality standards by finding and repairing moist conditions that existed in the house;

E. Defendants' employees or agents physically inspected the Subject Property after the complaints about toxic mold were made to Defendants and nothing was done to properly remedy the toxic mold infestation;

F.      Toxic mold spores were visible in plain sight so that Defendants' employees were able or should have been able to witness toxic mold growing in the houses and still did nothing to remedy the toxic mold infestation; and

G.      Defendants failed to honor the lease provision which allows for relocation of the tenant in the event the housing becomes uninhabitable. Further the lease provides that "Owner shall pay the cost of the relocation."

34.

As a direct and proximate result of Defendants' breaching the contract with Plaintiffs and providing an unreasonably dangerous house, Plaintiffs sustained serious and painful, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT IV

## CIVIL CONSPIRACY

35.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 34.

36.

At all times mentioned herein, Defendants operated under an agreement between two or more persons or entities to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property. Additionally, each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs.

## COUNT V

## ALTER EGO

### 37.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 36.

### 38.

At all times mentioned herein, Defendants, and each of them, inclusive of Unknown John and Jane Does A through M and Unknown Entities N through Z, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Defendants disregarded corporate formalities and used the corporate form to commit the aforementioned malfeasance. Upon information and belief, all Defendants are responsible in some manner for the events described herein and liable to Plaintiffs for the damages they have incurred.

## COUNT VI

## FRAUDULENT CONCEALMENT

### 39.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 38.

### 40.

Defendants are guilty of fraudulent concealment which, in accordance with Miss. Code §15-1-67, results in Plaintiffs' cause of action accruing when "such fraud shall be, or with reasonable diligence might have been, first known or discovered." The fraudulent actions of Defendants are:

A.      Defendants took affirmative action designed or intended to prevent Plaintiffs from discovering the presence of toxic mold in their home, which affirmative action did in fact work to prevent them from discovering the toxic mold, until such time as action was taken by Plaintiffs to confirm the presence of the toxic mold;

B.      Defendants' maintenance technicians repeatedly reported that the toxic mold and leaks were located, repaired and removed when in fact they were not;

C.      Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed;

D.      Defendants did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed; and

E.      Defendants did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable.

## COUNT VII

## INTENTIONAL ENDANGERMENT

41.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 40.

42.

At all times mentioned herein, Defendants' actions were intentional and endangering to Plaintiffs. This included intentionally endangering Plaintiffs by allowing them to live in dangerous housing conditions, intentionally endangering Plaintiffs by allowing the dangerous conditions to persist, intentionally endangering Plaintiffs by failing to remedy the dangerous

conditions, and intentionally endangering Plaintiffs by failing to relocate Plaintiffs after the dangerous conditions were discovered.

## DISCOVERY RULE

43.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 42.

44.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the discovery rule. Plaintiffs suffered from a latent injury, undiscoverable by reasonable means. Plaintiffs neither knew nor should have known that they had been harmed, much less that their harm was caused by the wrongful conduct of Defendants until such time that was within the limitations period  applicable to the claims they have asserted.

## CONTINUING TORT

45.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 44.

46.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the continuing tort doctrine. Defendants inflicted injury upon Plaintiffs over a period of time by engaging in continuous wrongful conduct which has continued while Plaintiffs continue to live in the Subject Property.

## DISABILITY OF INFANCY

47.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 46.

48.

Mikaila Fox, Haley Fox, Christopher M. Fox, Tristan Fox, and Easton Fox are minors, tolling the applicable statute of limitations in accordance with the minors savings clause. See Miss. Code Ann. § 15-1-59.

## DAMAGES

49.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 48.

50.

As a direct and proximate result of the Defendants' wrongful and negligent conduct, Plaintiffs sustained serious injuries, losses, and damages as follows:

A. Plaintiff, Christopher J. Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

B. Plaintiff, Karen Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

C. Plaintiff, Mikaila Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and

necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

D. Plaintiff, Haley Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

E. Plaintiff, Christopher M. Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

F. Plaintiff, Tristan Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

G. Plaintiff, Easton Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for.

## PUNITIVE DAMAGES

### 51.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 50.

### 52.

At all times mentioned herein, Defendants acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Defendants should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Specifically, after considering Defendants' financial condition and net worth, the nature and reprehensibility of Defendants' wrongdoing, Defendants' awareness of the amount of harm being caused, and Defendants' motivation in causing such harm, the duration of Defendants' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1-65, Defendants should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS' FEES

### 53.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 52.

### 54.

Defendants are liable for all reasonable attorneys' fees, costs, and expenses incurred in pursuit of this cause if found liable for punitive damages or fraud.

## PRAYER

WHEREFORE, Plaintiffs pray that after due proceedings are had that a Judgment be rendered in favor of Plaintiffs and against Defendants for damages in an amount to be proven at the trial of this cause, said damages including actual damages, compensatory damages and any other such damages to which Plaintiffs may be entitled and which may be proven at the trial of this cause,  for a punitive damages amount based on Defendants' financial condition and net worth, for attorneys' fees, for post-judgment interest, or for such other amount consistent with the statutory scheme in Mississippi for the awarding of such damages, for all costs of this cause and for such other relief to which Plaintiffs may be entitled under the premises.

Respectfully submitted,

**CHRISTOPHER J. FOX, KAREN FOX AND MIKAILA FOX, HALEY FOX, CHRISTOPHER M. FOX, TRISTAN FOX, AND EASTON FOX, MINORS, BY AND THROUGH THEIR NATURAL GUARDIANS, CHRISTOPHER FOX AND KAREN FOX, PLAINTIFFS**

BY: _____

**WILLIAM LEE GUICE III
MS BAR # 5059
MARIA MARTINEZ
MS BAR # 9951
RUSHING & GUICE, P.L.L.C.
P. O. BOX 1925
BILOXI, MS  39533
TELEPHONE: (228) 374-2313
FAX:  (228) 875-5987
ATTORNEYS FOR PLAINTIFFS**



**PRO-LAB**

1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

TEDDY BEAR RESTORATION

9230 OLD LORRAINE RD

GULFPORT, MS  39503

# Certificate of Mold Analysis

| | |
|---|---|
| Prepared for: | TEDDY BEAR RESTORATION |
| Phone Number: | |
| Fax Number: | |
| Project Name: | CHRISTOPHER FOX |
| Test Location: | 406 BILLY MITCHELLE CIRCLE |
| | BILOXI, MS  39531 |
| Chain of Custody #: | 1080103 |
| Received Date: | October 17, 2017 |
| Report Date: | October 18, 2017 |

Carlos Ochoa, Technical and Quality Control Manager

---

Currently there are no Federal regulations for evaluating potential health effects of fungal contamination and remediation. This information is subject to change as more information regarding fungal contaminants becomes available. For more information visit http://www.epa.gov/mold or www.nyc.gov/html/doh/html/epi/mold shtml. This document was designed to follow currently known industry guidelines for the interpretation of microbial sampling, analysis, and remediation. Since interpretation of mold analysis reports is a scientific work in progress, it may as such be changed at any time without notice. The client is solely responsible for the use or interpretation. PRO-LAB/SSP™ Inc makes no express or implied warranties as to health of a property from only the samples sent to their laboratory for analysis. The Client is hereby notified that due to the subjective nature of fungal analysis and the mold growth process, laboratory samples can and do change over time relative to the originally sampled material. PRO-LAB/SSP™ Inc. reserves the right to properly dispose of all samples after the testing of such samples are sufficiently completed or after a 7 day period, whichever is greater



AIHA LAP, LLC
ACCREDITED LABORATORY
ENVIRONMENTAL MICROBIOLOGY
ISO/IEC 17025:2005

WWW.AIHAACCREDITEDLABS.ORG

LAB #63033

**For more information please contact PRO-LAB at (954) 384-4446 or email info@prolabinc.com**



EXHIBIT

A



**PRO-LAB**

1675 North Commerce Parkway, Weston, FL  33326   (954) 384-4446

**Prepared for :** TEDDY BEAR RESTORATION

**Test Address :** CHRISTOPHER FOX
406 BILLY MITCHELLE CIRCLE
BILOXI, MS  39531

| ANALYSIS METHOD | Spore trap analysis | | | Spore trap analysis | | | INTENTIONALLY BLANK | | | INTENTIONALLY BLANK | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOCATION | BY A/C RETURN INSIDE | | | BY FRONT DOOR OUTSIDE | | | | | | | | |
| COC / LINE # | 1080103-1 | | | 1080103-2 | | | | | | | | |
| SAMPLE TYPE & VOLUME | Z5 - 5L | | | Z5 - 5L | | | | | | | | |
| SERIAL NUMBER | Q461366 | | | Q461311 | | | | | | | | |
| COLLECTION DATE | Oct 13, 2017 | | | Oct 13, 2017 | | | | | | | | |
| ANALYSIS DATE | Oct 18, 2017 | | | Oct 18, 2017 | | | | | | | | |
| CONCLUSION | NOT ELEVATED | | | CONTROL | | | | | | | | |

| IDENTIFICATION | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cercospora | | | | 1 | 200 | <1 | | | | | | |
| Cladosporium | 10 | 2,000 | 20 | 24 | 4,800 | 9 | | | | | | |
| Curvularia | 1 | 200 | 2 | 3 | 600 | 1 | | | | | | |
| Nigrospora | | | | 2 | 400 | 1 | | | | | | |
| Other Ascospores | | | | 10 | 2,000 | 4 | | | | | | |
| Other Basidiospores | 3 | 600 | 6 | 183 | 37,000 | 73 | | | | | | |
| Penicillium/Aspergillus | 36 | 7,200 | 71 | 21 | 4,200 | 8 | | | | | | |
| Smuts, myxomycetes | | | | 7 | 1,400 | 3 | | | | | | |
| Spegazzinia | 1 | 200 | 2 | | | | | | | | | |
| Unidentified Spores | | | | 1 | 200 | <1 | | | | | | |
| TOTAL SPORES | 51 | 10,200 | 100 | 252 | 50,800 | 100 | | | | | | |
| MINIMUM DETECTION LIMIT | 1 | 200 | | 1 | 200 | | | | | | | |
| BACKGROUND DEBRIS | Light | | | present | | | | | | | | |

| OBSERVATIONS & COMMENTS | | Debris: Moderate |
|---|---|---|

Background debris qualitatively estimates the amount of particles that are not pollen or spores and directly affects the accuracy of the spore counts  The categories of Light, Moderate, Heavy and Too Heavy for Accurate Count  are used to indicate the amount of deposited debris  Light (None to up to 25% obstruction), Medium (25% to up to 75% obstruction)  Heavy (76% to up to 90% obstruction)  Too Heavy (Greater than 90% obstruction)  Increasing amounts of debris will obscure small spores and can prevent spores from impacting onto the slide  The actual number of spores present in the sample is likely higher than reported if the debris estimate is 'Heavy' or 'Too Heavy for Accurate Count'  All calculations are rounded to two significant figures and therefore, the total percentage of spore numbers may not equal 100%
* Minimum Detection Limit  Based on the volume of air sampled, this is the lowest number of spores that can be detected and is an estimate of the lowest concentration of spores that can be read in the sample
NA = Not Applicable.

Spores that were observed from the samples submitted are listed on this report.  If a spore is not listed on this report it was not observed in the samples submitted.

Interpretation Guidelines: A determination is added to the report to help users interpret the mold analysis results  A mold report is only one aspect of an indoor air quality investigation  The most important aspect of mold growth in a living space is the availability of water  Without a source of water, mold generally will not become a problem in buildings  These determinations are in no way meant to imply any  health outcomes or financial decisions based solely on this report  For questions relating to medical conditions you should consult an occupational or environmental health physician or professional
CONTROL is a baseline sample showing what the spore count and diversity is at the time of sampling  The control sample(s) is usually collected outside of the structure being tested and used to determine if this sample(s) is similar in diversity and abundance to the inside sample(s)
ELEVATED means that the amount and/or diversity of spores, as compared to the control sample(s)  and other samples in our database  are higher than expected  This can indicate that fungi have grown because of a water leak or water intrusion  Fungi that are considered to be indicators of water damage include, but are not limited to  Chaetomium  Fusarium  Memnoniella, Stachybotrys, Scopulariopsis, Ulocladium
NOT ELEVATED means that the amount and/or the diversity of spores, as compared to the control sample and other samples in our database, are lower than expected and may indicate no problematic fungal growth
UNUSUAL means that the presence of current or former growth was observed in the analyzed sample  An abundance of spores are present, and/or growth structures including hyphae and/or fruiting bodies are present and associated with one or more of the types of mold/fungi identified in the analyzed sample
NORMAL means that no presence of current or former growth was observed in the analyzed sample  If spores are recorded they are normally what is in the air and have settled on the surface(s) tested



1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

Chain of Custody #   1080103



By A/c Return Inside

By Front Door Outside



**PRO-LAB**

1675 North Commerce Parkway, Weston, FL 33326   (954) 384-4446

| Identification | Outdoor Habitat | Indoor Habitat | Possible Allergic Potential<br>Not an opinion or interpretation | Comments |
|---|---|---|---|---|
| Cercospora | Common everywhere, especially growing on leaves. | Not known to grow indoors. | None known. | |
| Cladosporium | The most common spore type reported in the air worldwide. Found on dead and dying plant litter, and soil. | Commonly found on wood and wallboard. Commonly grows on window sills, textiles and foods. | Type I (hay fever and asthma), Type III (hypersensitivity pneumonitis) allergies. | A very common and important allergen source both outdoors and indoors. |
| Curvularia | Commonly found everywhere on soil and plant debris. | Capable of growing on many cellulytic substrates like wallboard and wood. | Type I (hay fever and asthma) and common cause of allergenic sinusitis. | |
| Nigrospora | Commonly found everywhere. Grows on decaying plant material | Does not normally grow on building materials, but occasionally can be found growing on wallboard. | Type I (hay fever and asthma) allergies. | Very distinctive spore that is easy to identify. |
| Ascospores | Common everywhere. Constitutes a large part of the airspora outside. Can reach very high numbers in the air outside during the spring and summer. Can increase in numbers during and after rainfalls. | Very few of this group grow inside. The notable exception is Chaetomium, Ascotricha and Peziza. | Little known for most of this group of fungi. Dependent on the type (see Chaetomium and Ascotricha). | |
| Basidiospores | Commonly found everywhere, especially in the late summer and fall. These spores are from Mushrooms. | Mushrooms are not normally found growing indoors, but can grow on wet lumber, especially in crawlspaces. Sometimes mushrooms can be seen growing in flower pots indoors. | Some allergenicity reported. Type I (hay fever, asthma) and Type III (hypersensitivity pneumonitis) | Among the group of Mushrooms (Basidiomycetes) are dry rot fungi Serpula and Poria that are particularly destructive to buildings. |
| Penicillium/Aspergillus | Common everywhere. Normally found in the air in small amounts in outdoor air. Grows on nearly everything. | Wetted wallboard, wood, food, leather, etc. Able to grow on many substrates indoors. | Type I (hay fever and asthma) allergies and Type III (hypersensitivity pneumonitis) allergies. | This is a combination group of Penicillium and Aspergillus and is used when only the spores are seen. The spores are so similar that they cannot be reliably separated into their respective genera. |
| Smuts, myxomycetes | Commonly found everywhere, especially on logs, grasses and weeds. | Smuts don't normally grow indoors, but can occasionally be found on things brought from outside and stored in the house. Myxomycetes can occasionally grow indoors, but need lots of water to be established. | Type I (hay fever and asthma) allergies. | Smuts and myxomycetes are a combined group of organisms because their spores look so similar and cannot be reliably distinguished from each other. |
| Spegazzinia | Not commonly observed, but widely distributed. | Not known to grow indoors. | None known. | Frequently seen especially in southern United States. |

**PRO-LAB**

1675 North Commerce Parkway, Weston, FL. 33326   (954) 384-4446

| Identification | Outdoor Habitat | Indoor Habitat | Possible Allergic Potential<br>Not an opinion or interpretation | Comments |
|---|---|---|---|---|
| Unidentified Spores | Common everywhere. Grow on decaying plant litter and other plant-derived material. | Wetted cellulosic material. | None known. | This group of spores is reserved for spores whose identity is unknown. These kinds of spores have usually never been seen before in spore traps by our laboratory and/or are of such morphology that they cannot be identified with any degree of certainty to a particular genus. |

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

CHRISTOPHER J. FOX, KAREN FOX AND
MIKAILA FOX, HALEY FOX, CHRISTOPHER M.
FOX, TRISTAN FOX AND EASTON FOX,
MINORS, BY AND THROUGH THEIR NATURAL
GUARDIANS, CHRISTOPHER J. FOX AND KAREN FOX                    **PLAINTIFFS**

                                                      CAUSE NO. A2402-2017-143

VERSUS

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z              **DEFENDANTS**

## SUMMONS

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

TO:   **Hunt MH Property Management, LLC**
      **c/o Registered Agent**
      **Capitol Corporate Services, Inc.**
      **248 E. Capitol Street, Suite 840**
      **Jackson, Mississippi 39201**
      **OR WHEREEVER THEY MAY BE FOUND**



### NOTICE TO DEFENDANT(S)

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU
MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.

    You are required to mail or hand-deliver a copy of a written response to the Complaint to **Rushing
& Guice, P. L. L. C.**, the attorneys for Plaintiffs, whose address is **Post Office Box 1925, Biloxi,
Mississippi 39533-1925** and whose street address is **1000 Government Street, Suite E, 2nd Floor, Ocean
Springs, Mississippi 39564**.  Your response must be mailed or delivered within thirty (30) days from the
date of delivery of this Summons and Complaint or a Judgment by default will be entered against you for
the money or other things demanded in the Complaint.

    You must also file the original of your response with the Clerk of this Court within a reasonable
time afterward.

    Issued under my hand and the seal of said Court, on this the 22 day of Dec. , 2017.

(SEAL)                                      Connie Ladner ___Clerk

                                    BY: _____D.C.

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

CHRISTOPHER J. FOX, KAREN FOX AND
MIKAILA FOX, HALEY FOX, CHRISTOPHER M.
FOX, TRISTAN FOX, AND EASTON FOX,
MINORS, BY AND THROUGH THEIR NATURAL
GUARDIANS, CHRISTOPHER J. FOX AND KAREN FOX          **PLAINTIFFS**

VERSUS                                    CAUSE NO. A2402-2017-103

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z          **DEFENDANTS**

### COMPLAINT

### JURY TRIAL REQUESTED

COME NOW Plaintiffs, Christopher J. Fox, Karen Fox, and Mikaila Fox, Haley Fox,

Christopher M. Fox, Tristan Fox, and Easton Fox, Minors, by and through their natural

guardians, Christopher J. Fox and Karen Fox (Plaintiffs), by and through their attorneys, Rushing

& Guice, P.L.L.C., and file this their Complaint against Hunt Southern Group, LLC fka Forest

City Southern Group, LLC, Forest City Residential Management, LLC, Hunt MH Property

Management, LLC, Unknown John and Jane Does A through M, and Other Unknown Corporate

Entities N through Z (Defendants), and for good cause of action, states unto the Court the

following, to-wit:



FILED

DEC 2 2 2017

CONNIE LADNER
CIRCUIT CLERK

BY:_____D.C.

## PARTIES

1.

Plaintiff, Christopher J. Fox ("Christopher J."), is an adult citizen of Jackson County, Mississippi residing at 125 Brackish Place, Ocean Springs, Mississippi.

2.

Plaintiff, Karen Fox ("Karen"), is an adult citizen of Jackson County, Mississippi residing at 125 Brackish Place, Ocean Springs, Mississippi.

3.

Plaintiff, Mikaila Fox ("Mikaila"), is the minor child of Christopher and Karen, her natural guardians, born August 15, 2001, and is a resident of the State of Mississippi, residing at 125 Brackish Place, Ocean Springs, Mississippi.

4.

Plaintiff, Haley Fox ("Haley"), is the minor child of Christopher and Karen, her natural guardians, born December 23, 2002, and is a resident of the State of Mississippi, residing at 125 Brackish Place, Ocean Springs, Mississippi.

5.

Plaintiff, Christopher M. Fox ("Christopher M."), is the minor child of Christopher and Karen, his natural guardians, born September 28, 2005, and is a resident of the State of Mississippi, residing at 125 Brackish Place, Ocean Springs, Mississippi.

6.

Plaintiff, Tristan Fox ("Tristan"), is the minor child of Christopher and Karen, his natural guardians, born November 15, 2007, and is a resident of the State of Mississippi, residing at 125 Brackish Place, Ocean Springs, Mississippi.

7.

Plaintiff, Easton Fox ("Easton"), is the minor child of Christopher and Karen, his natural guardians, born June 26, 2010, and is a resident of the State of Mississippi, residing at 125 Brackish Place, Ocean Springs, Mississippi.

8.

Defendant, Hunt Southern Group, LLC (Hunt Southern), formerly known as Forest City Southern Group, LLC (Forest City Southern) is a Delaware Limited Liability Company registered to do business in Mississippi. On March 18, 2016, Forest City Southern Group, LLC filed Articles/Certificate of Amendment with the Mississippi Secretary of State, changing its name to Hunt Southern Group, LLC. Hunt Southern fka Forest City Southern may be served through it registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Hunt Southern fka Forest City Southern is believed to be the owner of the property in issue.

9.

Defendant, Forest City Residential Management, LLC (Forest City Residential Management), is an Ohio Limited Liability Company, formally known as Forest City Residential Management, Inc., whose registration in Mississippi was administratively dissolved on November 30, 2016. Forest City Residential Management may be served with process by serving its registered agent for process, FCE Statutory Agent, Inc., 50 Public Square, Suite 1360, Cleveland, Ohio 44113. Forest City Residential Management is listed as the agent for Forest City Southern Group on the lease for the property in issue.

10.

Defendant, Hunt MH Property Management, LLC (Hunt MH Property Management), is a Delaware Limited Liability Company, registered to do business in Mississippi and may be served through its registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Based on information and belief, Hunt MH Property Management is the agent of Hunt Southern and has been charged with the maintenance and upkeep of the property in issue.

11.

Other Unknown John and Jane Does A through M are unknown Defendants who may be seasonably supplemented after discovery.

12.

Other Unknown Corporate Entities N through Z are unknown Defendants who may be seasonably supplemented after discovery.

## JURISDICTION AND VENUE

13.

Jurisdiction is proper in this Court under Miss. Code Ann. § 9-7-81. Venue is proper in Harrison County as this is the location where the injuries were sustained, where the cause of action accrued and where Plaintiffs resided. Jurisdiction is also proper pursuant to Miss. Code Ann. § 13-3-57 since Defendants were doing business within the State, made contracts with Plaintiffs, who are residents of Mississippi, those contracts were performed wholly within Harrison County, Mississippi, Second Judicial District, and the alleged tort was committed against Plaintiffs in Mississippi. Defendants, therefore, should be subjected to the jurisdiction of Mississippi courts.

## FACTS

### 14.

Christopher J. is a Lieutenant with the United States Navy. In August of 2014 Christopher J. moved his family to Biloxi, Mississippi as part of a routine change of station. Like other military families moving to the area, the military housing assignment for Plaintiffs was controlled by Defendant Hunt Southern fka Forest City Southern.

### 15.

On or about August 1, 2014 Plaintiffs entered into a Military Lease Agreement for military housing in the Bayridge Neighborhood located at 406 Billy Mitchell Circle in Biloxi, Mississippi in the County of Harrison (Subject Property). Plaintiffs moved into the Subject Property in September of 2014. The Subject Property is located in the Bayridge Neighborhood, an exclusive Officers and Senior enlisted Community. Bayridge is comprised of 330 homes and is located on Keesler Air Force Base. At all times mentioned herein, Plaintiffs' home was owned, controlled or managed by one of Defendants.

### 16.

At the time Plaintiffs entered into the Military Lease Agreement, Bayridge was owned and operated by Forest City Southern and managed through Forest City Residential Management. In 2016, Bayridge was acquired by Hunt Southern and operated or managed through Hunt MH Property Management. Upon information and belief Forest City Southern and Hunt Southern exercised custody and control over Bayridge and acted as the owners of Bayridge through a fifty year lease initiated by the United States Department of Defense through a program called the Military Housing Privatization Initiative. Essentially, while Defendants own

the improvements on the land and maintain custody and control of the property, the United States maintains an ownership interest in the land.

17.

While residing in the Subject Property, Plaintiffs repeatedly reported maintenance concerns involving mold and water damage. Despite Defendants' maintenance technicians reporting that the mold and leaks were resolved, it was learned that the air conditioner ductwork had a sweating problem and that the mold problem was more pervasive. This duct sweating, caused by poorly insulated ductwork, contributed to the mold and water damage throughout the house. Further it has been recently shown that Defendants have taken significant steps to replace the ductwork in many of the houses they operate.

18.

Plaintiffs' repeatedly requested that Defendants address mold and leaking problems while residing in the Subject Property. Rather than removing the mold, Defendants cleaned the mold with "soap and water." Fraudulent misrepresentations were made to Plaintiffs by Defendants regarding the removal of the mold. Plaintiffs were told that the mold problem had been rectified when in fact the cause of the water damage was not addressed. Throughout the entire time Plaintiffs resided in the Subject Property, Defendants never replaced the air conditioner filters. Plaintiffs replaced the filters on their own.

19.

Rather than addressing the cause of the leaks, Defendants' maintenance technicians cleaned the mold with soap and water. This allowed for the toxic mold to continue flourishing beneath the surface. Although Defendants learned that condensation was coming from attic ductwork, nothing was done to repair the moisture problem.

20.

On October 13, 2017, testing was performed on the Subject Property with Teddy Bear Restoration. Teddy Bear performed a Spore Trap Analysis and tested both outside and inside the Subject Property for mold spores. The reports showed high levels of Aspergillus inside the Subject Property with less being found outside the Subject Property. These elevated levels of toxic mold are well-known for causing serious health concerns. See Teddy Bear Restoration Mold Report attached hereto as **Exhibit "A."**

21.

Plaintiffs have obtained information from other military housing families leading them to believe that mold issues such as those experienced in their home were commonplace, having occurred in other military housing owned and operated by Defendants including others in Bayridge.

22.

As a direct result of the continued exposure to toxic mold located in Plaintiffs' home, all of which was known to Defendants, Plaintiffs have suffered and continue to suffer physical injuries, medical expenses and property damage.

23.

The Subject Property is a water damaged building, a residential structure which has been subject to excessive water intrusion from both external and internal water leaks and moisture accumulation. The term "water damaged building" is also used in conjunction with a descriptive term now used by the National Academies of Science, the U.S. Centers for Disease Control, and the World Health Organization, i.e., "damp indoor spaces" and "mold related illness," all of which collectively describe a mixture of biologically generated contaminates known to cause

adverse human health effects. Damp Indoor Spaces are now recognized by multiple federal and medical authorities as a public-health problem, contributing to tens of thousands of illnesses across the country and billions of dollars in medical costs.

24.

In this case, Plaintiffs had a certified mold investigator identify excessive mold growth and moisture inside the house, typical of a damp indoor space, both by sampling and visual observation. Aspergillus, known to be a powerful respiratory irritant, was found in the home during the air test. This spore is particularly dangerous, as it is well known to grow in excessive numbers in damp indoor spaces and to release mycotoxins and VOCs, and have toxic impacts of its own. The tests exceeded all bounds of sampling error and demonstrate the extremely dangerous conditions Plaintiffs are forced to live in.

25.

Defendants, as large, national managers and owners of thousands of apartment and residential units knew full well of the health risks associated with water damaged buildings and mold. Defendants failed to remediate mold in the Subject Property and caused serious injury and property loss to Plaintiffs as a result.

## COUNT I

## NEGLIGENCE

26.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 25.

27.

Defendants, as owners and/or managers of Bayridge:

A. Failed to provide a reasonably safe premises in accordance with the Military Lease Agreement, which amounted to a breach of the implied warranty of habitability;

B. Negligently failed to pay for relocation expenses;

C. Failed to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by Plaintiffs;

D. Negligently failed to maintain the air conditioning system and ducts in such a way allowing ideal conditions for toxic mold to grow in the Plaintiffs' house, including never replacing the air conditioner filters;

E. Negligently managed and maintained Bayridge;

F. Negligently supervised their employees, agents and/or representatives;

G. Negligently trained and supervised their employees, agents and/or representatives;

H. Negligently inspected Bayridge for dangerous and harmful conditions;

I. Negligently remediated the toxic mold contained in the Subject Property;

J. Knew or should have known that the house contained dangerous levels of toxic mold and did nothing to remedy the toxic mold infestation;

K. Failed to exercise reasonable care to repair dangerous defective conditions, which included the existence of mass amounts of toxic mold in the Subject Property, upon notice of their existence by Plaintiffs;

L. Negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold; and

M.    Failed to prevent any and all other acts of negligence which may be proven at trial by failing to fulfill its duties to Plaintiffs, thus causing damages which they have suffered.

28.

As a direct and proximate result of the negligence of Defendants, Plaintiffs sustained serious and painful personal injuries, extreme mental and physical pain and suffering, anxiety, anguish and upset,  losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

**COUNT II**

**GROSS NEGLIGENCE**

29.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 28.

30.

At all times mentioned herein, Defendants acted with gross negligence in total disregard of the duties owed to Plaintiffs to the degree that said gross negligence constitutes an intentional act.

31.

As a direct and proximate result of the gross negligence of Defendants, Plaintiffs have suffered injuries as described herein.

## COUNT III

## BREACH OF CONTRACT

32.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 31.

33.

Defendants breached the Military Lease Agreement entered into with Plaintiffs on August 1, 2014. The contract was breached for the following reasons:

A.    Defendants violated the Implied Covenant of Good Faith and Fair Dealing when they failed to deal fairly and in good faith causing Plaintiffs to not benefit from the contract;

B.    Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they leased to Plaintiffs a house that was not fit for human habitation;

C.    The negligent management and maintenance of the property led to the moist environment, which is ideal for toxic mold growth;

D.    Defendants failed to successfully complete the annual physical maintenance inspection of the property to ensure the house was up to housing maintenance quality standards by finding and repairing moist conditions that existed in the house;

E.    Defendants' employees or agents physically inspected the Subject Property after the complaints about toxic mold were made to Defendants and nothing was done to properly remedy the toxic mold infestation;

F.  Toxic mold spores were visible in plain sight so that Defendants' employees were able or should have been able to witness toxic mold growing in the houses and still did nothing to remedy the toxic mold infestation; and

G.  Defendants failed to honor the lease provision which allows for relocation of the tenant in the event the housing becomes uninhabitable. Further the lease provides that "Owner shall pay the cost of the relocation."

34.

As a direct and proximate result of Defendants' breaching the contract with Plaintiffs and providing an unreasonably dangerous house, Plaintiffs sustained serious and painful, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT IV

## CIVIL CONSPIRACY

35.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 34.

36.

At all times mentioned herein, Defendants operated under an agreement between two or more persons or entities to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property. Additionally, each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs.

## COUNT V

## ALTER EGO

### 37.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 36.

### 38.

At all times mentioned herein, Defendants, and each of them, inclusive of Unknown John and Jane Does A through M and Unknown Entities N through Z, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Defendants disregarded corporate formalities and used the corporate form to commit the aforementioned malfeasance. Upon information and belief, all Defendants are responsible in some manner for the events described herein and liable to Plaintiffs for the damages they have incurred.

## COUNT VI

## FRAUDULENT CONCEALMENT

### 39.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 38.

### 40.

Defendants are guilty of fraudulent concealment which, in accordance with Miss. Code §15-1-67, results in Plaintiffs' cause of action accruing when "such fraud shall be, or with reasonable diligence might have been, first known or discovered." The fraudulent actions of Defendants are:

A.     Defendants took affirmative action designed or intended to prevent Plaintiffs from discovering the presence of toxic mold in their home, which affirmative action did in fact work to prevent them from discovering the toxic mold, until such time as action was taken by Plaintiffs to confirm the presence of the toxic mold;

B.     Defendants' maintenance technicians repeatedly reported that the toxic mold and leaks were located, repaired and removed when in fact they were not;

C.     Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed;

D.     Defendants did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed; and

E.     Defendants did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable.

## COUNT VII

## INTENTIONAL ENDANGERMENT

41.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 40.

42.

At all times mentioned herein, Defendants' actions were intentional and endangering to Plaintiffs. This included intentionally endangering Plaintiffs by allowing them to live in dangerous housing conditions, intentionally endangering Plaintiffs by allowing the dangerous conditions to persist, intentionally endangering Plaintiffs by failing to remedy the dangerous

conditions, and intentionally endangering Plaintiffs by failing to relocate Plaintiffs after the dangerous conditions were discovered.

## DISCOVERY RULE

### 43.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 42.

### 44.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the discovery rule. Plaintiffs suffered from a latent injury, undiscoverable by reasonable means. Plaintiffs neither knew nor should have known that they had been harmed, much less that their harm was caused by the wrongful conduct of Defendants until such time that was within the limitations period applicable to the claims they have asserted.

## CONTINUING TORT

### 45.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 44.

### 46.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the continuing tort doctrine. Defendants inflicted injury upon Plaintiffs over a period of time by engaging in continuous wrongful conduct which has continued while Plaintiffs continue to live in the Subject Property.

## DISABILITY OF INFANCY

### 47.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 46.

48.

Mikaila Fox, Haley Fox, Christopher M. Fox, Tristan Fox, and Easton Fox are minors, tolling the applicable statute of limitations in accordance with the minors savings clause. See Miss. Code Ann. § 15-1-59.

## DAMAGES

49.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 48.

50.

As a direct and proximate result of the Defendants' wrongful and negligent conduct, Plaintiffs sustained serious injuries, losses, and damages as follows:

A. Plaintiff, Christopher J. Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

B. Plaintiff, Karen Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

C. Plaintiff, Mikaila Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and

necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

D. Plaintiff, Haley Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

E. Plaintiff, Christopher M. Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

F. Plaintiff, Tristan Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

G. Plaintiff, Easton Fox, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for.

## PUNITIVE DAMAGES

51.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 50.

52.

At all times mentioned herein, Defendants acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Defendants should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Specifically, after considering Defendants' financial condition and net worth, the nature and reprehensibility of Defendants' wrongdoing, Defendants' awareness of the amount of harm being caused, and Defendants' motivation in causing such harm, the duration of Defendants' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1-65, Defendants should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS' FEES

53.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 52.

54.

Defendants are liable for all reasonable attorneys' fees, costs, and expenses incurred in pursuit of this cause if found liable for punitive damages or fraud.

## PRAYER

WHEREFORE, Plaintiffs pray that after due proceedings are had that a Judgment be rendered in favor of Plaintiffs and against Defendants for damages in an amount to be proven at the trial of this cause, said damages including actual damages, compensatory damages and any other such damages to which Plaintiffs may be entitled and which may be proven at the trial of this cause,  for a punitive damages amount based on Defendants' financial condition and net worth, for attorneys' fees, for post-judgment interest, or for such other amount consistent with the statutory scheme in Mississippi for the awarding of such damages, for all costs of this cause and for such other relief to which Plaintiffs may be entitled under the premises.

Respectfully submitted,

**CHRISTOPHER J. FOX, KAREN FOX AND MIKAILA FOX, HALEY FOX, CHRISTOPHER M. FOX, TRISTAN FOX, AND EASTON FOX, MINORS, BY AND THROUGH THEIR NATURAL GUARDIANS, CHRISTOPHER FOX AND KAREN FOX, PLAINTIFFS**

BY: _____
**WILLIAM LEE GUICE III
MS BAR # 5059
MARIA MARTINEZ
MS BAR # 9951
RUSHING & GUICE, P.L.L.C.
P. O. BOX 1925
BILOXI, MS  39533
TELEPHONE: (228) 374-2313
FAX:  (228) 875-5987
ATTORNEYS FOR PLAINTIFFS**

 **PRO-LAB**

1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

TEDDY BEAR RESTORATION
9230 OLD LORRAINE RD
GULFPORT, MS  39503

# Certificate of Mold Analysis

Prepared for: TEDDY BEAR RESTORATION

Phone Number:

Fax Number:

Project Name: CHRISTOPHER FOX

Test Location: 406 BILLY MITCHELLE CIRCLE
BILOXI, MS  39531

Chain of Custody #: 1080103

Received Date: October 17, 2017

Report Date: October 18, 2017

Carlos Ochoa, Technical and Quality Control Manager

---

Currently there are no Federal regulations for evaluating potential health effects of fungal contamination and remediation. This information is subject to change as more information regarding fungal contaminants becomes available. For more information visit http://www.epa.gov/mold or www.nyc.gov/html/doh/html/epi/mold.shtml. This document was designed to follow currently known industry guidelines for the interpretation of microbial sampling, analysis, and remediation. Since interpretation of mold analysis reports is a scientific work in progress, it may as such be changed at any time without notice. The client is solely responsible for the use or interpretation. PRO-LAB/SSPTM Inc makes no express or implied warranties as to health of a property from only the samples sent to their laboratory for analysis. The Client is hereby notified that due to the subjective nature of fungal analysis and the mold growth process, laboratory samples can and do change over time relative to the originally sampled material. PRO-LAB/SSPTM Inc reserves the right to properly dispose of all samples after the testing of such samples are sufficiently completed or after a 7 day period, whichever is greater



AIHA LAP, LLC

ACCREDITED LABORATORY
ENVIRONMENTAL MICROBIOLOGY
ISO/IEC 17025:2005

WWW.AIHAACCREDITEDLABS.ORG

LAB# 163200

**For more information please contact PRO-LAB at (954) 384-4446 or email info@prolabinc.com**



EXHIBIT
A

Page 1 of 5



**PRO-LAB**

1675 North Commerce Parkway, Weston, FL  33326   (954) 384-4446

Prepared for : TEDDY BEAR RESTORATION

Test Address : CHRISTOPHER FOX
406 BILLY MITCHELLE CIRCLE
BILOXI, MS  39531

| ANALYSIS METHOD | Spore trap analysis | | | Spore trap analysis | | | INTENTIONALLY BLANK | | | INTENTIONALLY BLANK | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOCATION | BY A/C RETURN INSIDE | | | BY FRONT DOOR OUTSIDE | | | | | | | | |
| COC / LINE # | 1080103-1 | | | 1080103-2 | | | | | | | | |
| SAMPLE TYPE & VOLUME | Z5 - 5L | | | Z5 - 5L | | | | | | | | |
| SERIAL NUMBER | Q461386 | | | Q461311 | | | | | | | | |
| COLLECTION DATE | Oct 13, 2017 | | | Oct 13, 2017 | | | | | | | | |
| ANALYSIS DATE | Oct 18, 2017 | | | Oct 18, 2017 | | | | | | | | |
| CONCLUSION | NOT ELEVATED | | | CONTROL | | | | | | | | |

| IDENTIFICATION | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cercospora | | | | 1 | 200 | <1 | | | | | | |
| Cladosporium | 10 | 2,000 | 20 | 24 | 4,800 | 9 | | | | | | |
| Curvularia | 1 | 200 | 2 | 3 | 600 | 1 | | | | | | |
| Nigrospora | | | | 2 | 400 | 1 | | | | | | |
| Other Ascospores | | | | 10 | 2,000 | 4 | | | | | | |
| Other Basidiospores | 3 | 600 | 6 | 183 | 37,000 | 73 | | | | | | |
| Penicillium/Aspergillus | 36 | 7,200 | 71 | 21 | 4,200 | 8 | | | | | | |
| Smuts, myxomycetes | | | | 7 | 1,400 | 3 | | | | | | |
| Spegazzinia | 1 | 200 | 2 | | | | | | | | | |
| Unidentified Spores | | | | 1 | 200 | <1 | | | | | | |
| TOTAL SPORES | 51 | 10,200 | 100 | 252 | 50,800 | 100 | | | | | | |
| MINIMUM DETECTION LIMIT | 1 | 200 | | 1 | 200 | | | | | | | |
| BACKGROUND DEBRIS | Light | | | present | | | | | | | | |
| OBSERVATIONS & COMMENTS | | | | Debris: Moderate | | | | | | | | |

Background debris qualitatively estimates the amount of particles that are not pollen or spores and directly affects the accuracy of the spore counts. The categories of Light, Moderate, Heavy and Too Heavy for Accurate Count are used to indicate the amount of deposited debris. Light (None to up to 25% obstruction), Medium (26% to up to 75% obstruction), Heavy (76% to up to 90% obstruction), Too Heavy (Greater than 90% obstruction). Increasing amounts of debris will obscure small spores and can prevent spores from impacting onto the slide. The actual number of spores present in the sample is likely higher than reported if the debris estimate is Heavy or Too Heavy for Accurate Count. All calculations are rounded to two significant figures and therefore, the total percentage of spore numbers may not equal 100%.
* Minimum Detection Limit: Based on the volume of air sampled, this is the lowest number of spores that can be detected and is an estimate of the lowest concentration of spores that can be read in the sample.
NA = Not Applicable

Spores that were observed from the samples submitted are listed on this report. If a spore is not listed on this report it was not observed in the samples submitted.

Interpretation Guidelines: A determination is added to the report to help users interpret the mold analysis results. A mold report is only one aspect of an indoor air quality investigation. The most important aspect of mold growth in a living space is the availability of water. Without a source of water, mold generally will not become a problem in buildings. These determinations are in no way meant to imply any health outcomes or financial decisions based solely on this report. For questions relating to medical conditions you should consult an occupational or environmental health physician or professional.
CONTROL is a baseline sample showing what the spore count and diversity is at the time of sampling. The control sample(s) is usually collected outside of the structure being tested and used to determine if this sample(s) is similar in diversity and abundance to the inside sample(s).
ELEVATED means that the amount and/or diversity of spores, as compared to the control sample(s) and other samples in our database are higher than expected. This can indicate that fungi have grown because of a water leak or water intrusion. Fungi that are considered to be indicators of water damage include but are not limited to Chaetomium, Fusarium, Memnoniella, Stachybotrys, Scopulariopsis, Ulocladium.
NOT ELEVATED means that the amount and/or the diversity of spores, as compared to the control sample and other samples in our database, are lower than expected and may indicate no problematic fungal growth.
UNUSUAL means that the presence of current or former growth was observed in the analyzed sample. An abundance of spores are present and/or growth structures including hyphae and/or fruiting bodies are present and associated with one or more of the types of mold/fungi identified in the analyzed sample.
NORMAL means that no presence of current or former growth was observed in the analyzed sample. If spores are recorded they are normally what is in the air and have settled on the surface(s) tested.



**PRO-LAB**

1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

Chain of Custody #  1080103

Chain of Custody #  1080103    ▓▓▓▓    By A/c Return Inside

▓▓▓▓    By Front Door Outside



PRO-LAB    1675 North Commerce Parkway, Weston, FL 33326    (954) 384-4446

| Identification | Outdoor Habitat | Indoor Habitat | Possible Allergic Potential (Not an opinion or interpretation) | Comments |
| --- | --- | --- | --- | --- |
| Cercospora | Common everywhere, especially growing on leaves. | Not known to grow indoors. | None known. | |
| Cladosporium | The most common spore type reported in the air worldwide. Found on dead and dying plant litter, and soil. | Commonly found on wood and wallboard. Commonly grows on window sills, textiles and foods. | Type I (hay fever and asthma). Type III (hypersensitivity pneumonitis) allergies. | A very common and important allergen source both outdoors and indoors. |
| Curvularia | Commonly found everywhere on soil and plant debris. | Capable of growing on many cellulytic substrates like wallboard and wood. | Type I (hay fever and asthma) and common cause of allergenic sinusitis. | |
| Nigrospora | Commonly found everywhere. Grows on decaying plant material | Does not normally grow on building materials, but occasionally can be found growing on wallboard. | Type I (hay fever and asthma) allergies. | Very distinctive spore that is easy to identify. |
| Ascospores | Common everywhere. Constitutes a large part of the airspora outside. Can reach very high numbers in the air outside during the spring and summer. Can increase in numbers during and after rainfalls. | Very few of this group grow inside. The notable exception is Chaetomium, Ascotricha and Peziza. | Little known for most of this group of fungi. Dependent on the type (see Chaetomium and Ascotricha). | |
| Basidiospores | Commonly found everywhere, especially in the late summer and fall. These spores are from Mushrooms. | Mushrooms are not normally found growing indoors, but can grow on wet lumber, especially in crawlspaces. Sometimes mushrooms can be seen growing in flower pots indoors. | Some allergenicity reported. Type I (hay fever, asthma) and Type III (hypersensitivity pneumonitis). | Among the group of Mushrooms (Basidiomycetes) are dry rot fungi Serpula and Poria that are particularly destructive to buildings. |
| Penicillium/Aspergillus | Common everywhere. Normally found in the air in small amounts in outdoor air. Grows on nearly everything. | Wetted wallboard, wood, food, leather, etc. Able to grow on many substrates indoors. | Type I (hay fever and asthma) allergies and Type III (hypersensitivity pneumonitis) allergies. | This is a combination group of Penicillium and Aspergillus and is used when only the spores are seen. The spores are so similar that they cannot be reliably separated into their respective genera. |
| Smuts, myxomycetes | Commonly found everywhere, especially on logs, grasses and weeds. | Smuts don't normally grow indoors, but can occasionally be found on things brought from outside and stored in the house. Myxomycetes can occasionally grow indoors, but need lots of water to be established. | Type I (hay fever and asthma) allergies. | Smuts and myxomycetes are a combined group of organisms because their spores look so similar and cannot be reliably distinguished from each other. |
| Spegazzinia | Not commonly observed, but widely distributed | Not known to grow indoors. | None known. | Frequently seen especially in southern United States. |

**PRO-LAB**   1675 North Commerce Parkway, Weston, FL 33326   (954) 384-4446

| Identification | Outdoor Habitat | Indoor Habitat | Possible Allergic Potential Not an opinion or interpretation | Comments |
|---|---|---|---|---|
| Unidentified Spores | Common everywhere. Grow on decaying plant litter and other plant-derived material. | Wetted cellulosic material. | None known. | This group of spores is reserved for spores whose identity is unknown. These kinds of spores have usually never been seen before in spore traps by our laboratory and/or are of such morphology that they cannot be identified with any degree of certainty to a particular genus. |