UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

CHRISTOPHER FOX AND KAREN FOX AND
MIKAILA FOX, HALEY FOX, CHRISTOPHER FOX,
AND TRISTAN FOX AND EASTON FOX, MINORS,
BY AND THROUGH THEIR NATURAL GUARDIANS
CHRISTOPHER AND KAREN FOX                                        PLAINTIFFS

VS.                                              CAUSE NO. 1:18-cv00048-LG-RHW

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z          DEFENDANTS

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 241]

COME NOW Plaintiffs and file this their Response in Opposition to Hunt Defendants'

Motion for Summary Judgment (Document 241). In support of same Plaintiffs would show unto

the court the following:

## INTRODUCTION

Defendants now and in the past operated Privatized Housing at Keesler Air Force Base

(KAFB), Biloxi, Mississippi. Plaintiff was stationed at KAFB and was assigned housing at

KAFB in exchange for the service member's housing allotment (BAH). In effect, Plaintiffs and

their fellow service families became captives of Defendants' housing program.

At all times mentioned herein Defendants knew that the housing on KAFB was subpar,

defective and presented a health risk to these military tenants. Defendants failed to advise or

otherwise warn Plaintiffs of the known housing conditions and continued to rent same with

1

impunity. These rentals were subject to leases in which Defendants breached their warranty of habitability. The principal issue with the housing was moisture and toxic mold infestation. Family members became ill. In essence, our service members and their families were provided uninhabitable slum conditions and constructive eviction ensued amounting to a national disgrace which has prompted an investigation by the United States Senate.

The uncontested facts set forth below prove that Defendants were aware of ubiquitous mold and moisture problems in their housing but wasted time finding the correct solutions. No less than ten different reports spanning seven years highlight the pervasiveness of mold and moisture problems in housing supporting KAFB. These reports highlight several, disparate factors contributing to mold problems including humid air infiltration, improperly sized HVAC equipment, poorly insulated sheet metal surfaces, and duct leakage. These issues stem from various deficiencies in design, construction, and maintenance.

Defendants failed to permanently address the underlying causes of mold and moisture and chose to implement low-cost fixes that made the problems linger. Even though Defendants knew what corrective actions were needed, they were slow to implement permanent solutions. Instead, they implemented temporary solutions that lead to chronic mold problems. Although on paper it appears as if Defendants dutifully showed up to respond to complaints, they regularly applied "band-aid" fixes, avoided addressing the underlying conditions, and ignored standard industry practice. Defendants' inadequate responses resulted in Plaintiffs having ongoing exposure to a damp indoor environment and mold issues.

**<u>STANDARD OF REVIEW</u>**

Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled judgment as a matter of law. F.R.C.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S.317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In addition, the initial burden to demonstrate the absence of a genuine issue of material fact is on the movant. *Celotex*, 477 U.S. at 324, 106 S. Ct. 2458. "It is improper for the district court to 'resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence.'" *McDonald v. Entergy Operations, Inc.*, 2005 WL 2474701 (S.D.Miss.2005) (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir.1980)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making its determinations of fact on a motion for summary judgment, the court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984). Because Defendants cannot meet this threshold requirement for a successful motion for summary judgment, their motion should be denied. The purpose of a trial is to determine the truth and to hear the entire story when the facts are disputed.

## **UNDISPUTED FACTS - CHRONOLOGICAL OUTLINE**

| | |
|---|---|
| July 27, 2011 | Prior to purchasing the housing on Keesler AFB from the United States, Forest Southern Group, LLC KNA Hunt Southern Group, LLC acquired a List of 198 homes previously inspected at Keesler AFB that had the possible presence of mold (FCRM00000968 and FCRM00000969). **Exhibit 1.** |
| August 17, 2011 | Historical maintenance records show the air conditioning unit was leaking into the storage room. Fox-Hunt-Gen02-00016-00045 **Exhibit 17.** |
| September 12, 2011 | Prior to purchasing the housing on Keesler AFB from the United States, a Report of Limited Property Condition Assessment and Visual Infrastructure Assessment was prepared by AMEC E & I INC (FCRM00000859) for Forest City Military Communities LLC finding suspect visible mold in 56% of the on base units assessed and 54% of the |

off-base units assessed and recommended a that a Suspect Visual Mold Assessment be obtained. **Exhibit 2.**

September 21, 2011   Quitclaim Deed from USA to Forest Southern Group, LLC KNA Hunt Southern Group, LLC wherein the military housing on Keesler AFB was purchased. **Exhibit 3.**

September 30, 2011   United States Department of the Air Force Master Development and Management Agreement for the Privatization of Military Housing between the United States of America and Forest Southern Group, LLC KNA Hunt Southern Group, LLC which includes the defined term "Keesler Mold" and which states in Section 3.5.9 that "The Parties acknowledge that the presence of certain mold conditions at Keesler AFB as of the Effective Date (the "Keesler Mold") will require remediation, the plans for which and the full costs of which have not been determined as of the Effective Date. The Parties agree that the amount of $3,175,514 shall be deposited to the Project Contingency Subaccount held under the Lockbox Agreement on the Effective Date as a contingency to be used to remediate the Keesler Mold (the "Mold Contingency"). (Hunt – Gen04 – 00452). **Exhibit 4.**

September 30, 2011   Property Management Agreement between Forest Southern Group, LLC KNA Hunt Southern Group, LLC and Forest City Residential Management LLC wherein Forest City Residential Management LLC, acting as an independent contractor, agreed to maintain the property in habitable and lawful condition for the benefit of Plaintiffs. (Cooksey - Hunt - Gen04 – 00293). **Exhibit 5.**

September 30, 2011   Keesler Air Force Base Environmental Management Plan (Hunt - Gen05 – 01792) taking the position that "The presence of mold and fungus in occupied buildings may be a health risk under certain circumstances," that the "Response to mold toxins varies by individual, but those most likely to be sensitive to mold exposures include infants and children, the elderly, and those patients whose immune system has been compromised," that "Family Housing will be managed to prevent the occurrence of mold and fungus in occupied areas," that "If mold is identified, it will be abated as soon as practical," and that "The best management approach is to ensure that mold growth does not occur." **Exhibit 6.**

February 17, 2012   Four and a half months after purchase, a Report of Housing Assessment for Moisture Related Problems was generated by Liberty Building Forensics Group (FCRM00000361) finding ductwork leakage allowing outside air to enter and result in condensation on certain surfaces mostly around the AHU's, transfer grilles that are too small resulting in depressurization of the main part of the house under certain conditions,

that the outside air being introduced into the home is not sufficient to offset the wind effects and needs to be three times larger, that the AHU's are not sized to provide sufficient dehumidification, that the attic is the leakiest portion of the building envelope and is the main entry point for wind driven outdoor air in the homes, that air infiltration rates increase when the attic fan operates; that attic fan operation is not reducing attic dewpoint because fan operation alone is not a dehumidification process and that modifications to compressor staging are not sufficiently improving the run time. **Exhibit 7.**

August 3, 2012    Ten months after purchase, a Letter Bullet List to Further Delineate Implementation of Scope of Work Keesler AFB Housing Assessment for Moisture Related Problems was generated by Liberty Building Forensics Group (FCRM00000520) describing in detail the immediate interim repairs, the intermediate repairs and the long term repairs, all of which were at that time required to minimize conditions conducive to future moisture damage. **Exhibit 8.**

August 13, 2012    Historical maintenance records show that the air conditioning unit was leaking water from unit – interior of home and that moldex was sprayed at the bottom of the sheet rock. Fox-Hunt-Gen02-00016-00045 **Exhibit 17.**

October 2, 2012    One year after purchase, Building Science Corporation's Enclosure and HVAC Analysis of Housing Units on Keesler Air Force Base was generated (FCRM00001096) identifying two fundamental problems with the Keesler AFB housing units, excessive air change and depressurization and sweating sheet metal ducts. The report further explained that leaky ductwork leads to excessive air change and negative pressures within houses and excessive air change leads to elevated levels of interior moisture and interior surface mold. **Exhibit 9.**

November 6, 2012    Thirteen months after purchase, Rimkus Consulting Group Inc. HVAC System Evaluation Keesler Air Force Base Housing growth (FCRM00000931) retained to inspect a sample of the housing units that have experienced mold growth and provide recommendations to help limit or eliminate the formation of the suspected fungal growth and concluding that the fungal growth observed on the diffusers and the bathroom ceilings indicated areas of high humidity where moisture was condensing on cold surfaces, that additional attic ventilation would reduce condensation, that additional ventilation can be provided by fixing insulation baffles adding ridge vents or combining power ventilators with existing roof vents, that outside air ducts if used should be interlocked with the cooling mode and not the fan mode so that unconditioned air does not blow into the house, that bathroom fans should have back draft dampers installed so that unconditioned air does not leak into the bathrooms when the fan is not

operating, and that duct chases going from the air handler to the attic should not only be insulated but should also have a vapor and air seal. **Exhibit 10.**

December 18, 2012     Fourteen and one half months after purchase, a Mold Management Plan (FCRM00000726) was prepared by Forest City Military Communities LLC to provide guidance in the prevention, identification, remediation, communication, management and training related to mold in managed housing communities and recognized that the key to mold control is moisture control. **Exhibit 11.**

February 22, 2013     Seventeen months after purchase, after learning that the remediation cost would range from "several hundred thousand to more than seventeen million dollars," a plan was developed to repair only a sampling of 32 out of 998 units at a cost of $180,479, which would be left to sit for a "cooling season" to see if the repairs worked. (FCRM00001094). **Exhibit 12.**

March 18, 2013     Seventeen and one half months after purchase work finally commenced on 34 test units and was substantially complete on April 16, 2013. The 2 contractors working on the repairs gave reports to Forest City describing the defects to be corrected.

April 22, 2013     Nineteen months after purchase, a report titled Keesler AFB Privatized Housing Complex Residential Modifications Recommendations and Observations was generated by J.O. Collins Contractor Inc. (Hunt - Gen05 – 00193) opining that the major contributing factor with regard to the moisture issues that have plagued the units is the installation of the duct work, most of the units having ill fitted connections that were not screwed together properly, were not taped properly, were not sealed with mastic properly resulting in large gaps in some of the ductwork **Exhibit 13.**

April 26, 2013     Nineteen months after purchase, a report titled Observations on HVAC Rehabilitation was generated by Kimbel Mechanical Systems (Hunt - Gen05 – 00471) estimating that repairs could be made to all units in less than 1 year, "We can mobilize 3 separate teams for this project that could do 2 units per day after their initial 'ramping up period' was over. That should allow us a pace of about 120 units per month." **Exhibit 14.**

May 1, 2013     One year and seven months after purchase, a Prototype Completion Report HVAC Improvements Project was prepared by Forest City Military Communities (Hunt - Gen05 – 00363) containing a list of 12 defects existing in base housing and finding that the energy efficiency of the existing homes was likely compromised by the poor quality HVAC ductwork installation and  the existing conditions noted in the attic spaces of the subject prototype units and that the whole of the remaining housing

within the project would benefit by, and would likely require remediation. **Exhibit 15.**

| | |
|---|---|
| July 16, 2013 | Historical maintenance records show that the air conditioning unit was leaking from unit-interior of home. Fox-Hunt-Gen02-00016-00045 **Exhibit 17.** |
| November 27, 2013 | Historical maintenance records show that the heater was not working. Fox-Hunt-Gen02-00016-00045 **Exhibit 17.** |
| December 23, 2013 | Two years and three months after purchase, a report was  prepared by Forest City (FCRM00001001) summarizing the ongoing concerns over the poor construction workmanship and indoor air quality performance of the HVAC systems installed within the military family residential units at Keesler AFB and noting that the findings of both investigations to date were consistent and indicated that the indoor air quality and the ability to control moisture within the homes at Keesler AFB was compromised by the poor workmanship employed in the HVAC ductwork installation and finding continuing uncontrolled moisture concerns within the interstitial floor spaces of representative structures including moisture and mold build up on ceilings located in the upstairs of the homes and the downstairs sub floor areas. **Exhibit 16.** |
| January 6, 2014 | Historical maintenance records show that the heater is not working. Emergency heat was not hooked up right, Freon was low and shreader valve was leaking. Fox-Hunt-Gen02-00016-00045 **Exhibit 17.** |
| January 29, 2014 | Historical maintenance records show the heater was not coming on and it is 66 degrees in the home. Fox-Hunt-Gen02-00016-00045 **Exhibit 17.** |
| July 25, 2014 | Historical maintenance records show water was leaking from unit – interior of home. Flushed A/C unit drain line and remove water from mechanical room. Fox-Hunt-Gen02-00016-00045 **Exhibit 17.** |
| July 28, 2014 | Historical maintenance records show that a float switch was installed on the air conditioning unit. Fox-Hunt-Gen02-00016-00045 **Exhibit 17.** |
| October 1, 2014 | Plaintiff, Christopher Fox, rank O-4, entered into a Military Lease Agreement with Forest City Southern Group, LLC, NKA Hunt Southern Group, LLC (Owner), owner of the property located at 406 Billy Mitchell Circle, Biloxi, MS (Subject Property) on October 1, 2014. In accordance with the lease, the property was managed by Forest City Residential Management, LLC (Agent) who was authorized to manage the Subject Property on behalf of Owner and to receive rents, execute leases, enforce leases, and give and accept notices, demands and service of process on behalf of, and as Agent of Owner. **Exhibit 22.** |

October 1, 2014    Initial walkthrough/move in inspection of the Subject property took place. This walkthrough did not include an inspection of the attic or the interstitial areas of the home although prior investigations procured by Defendants indicated that these were the areas where the hidden latent defects involving most moisture and mold accumulation were located. Affidavit of Plaintiff. **Exhibit 23.**

December 6, 2012    Plaintiffs reported that the air conditioning was not cooling. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.**

January 21, 2015    Plaintiffs reported that the air conditioning was not cooling and was making high pitch squealing noises. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.**

February 27, 2015    Plaintiffs reported that air conditioning was leaking- outside unit. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.**

February 13, 2015    Three years and four and one half months after purchase, a Complaint was filed by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC against Hunt Building Company, Ltd., Hunt Yates, LLC, W.G. Yates & Sons Construction Company and others in the in the Circuit Court of Harrison County, Mississippi Second Judicial District referred to by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC as the "latent defect claim." **Exhibit 18.**

This latent defect claim asserted that defects, hidden from view by the fraudulent actions of the defendants, existed in housing on Keesler Air Force Base and that after Forest City took over ownership of KAFB housing it begin to receive complaints from residents about water infiltration and indoor air quality issues, that these complaints revealed potential problems with the building design and construction, as well as the performance of the HVAC systems, that an apparent attempt to address the ongoing problems with the structures failed to adequately address the problems, that in an attempt to conclusively establish the cause(s) of the problems reported by the residents Forest City created and implemented a remediation plan on a sample of the 1028 structures which universally revealed "shoddy workmanship" and proceeded to describe the "shoddy workmanship" with a list that detailed no less than ten latent defects.

The complaint further describes the hidden defects discovered by them after purchasing the properties  as follows: "numerous branch duct and main trunk runs were found to be unsupported and buried below the blown in insulation in order to fraudulently conceal the shoddy workmanship" and "the shoddy workmanship was fraudulently concealed in a manner intended to prevent discovery" and "Hunt, Hunt Yates, and/or Yates knew or should have known of the existence of these defects prior to covering

them with insulation or closing them in inaccessible locations and therefore fraudulently concealed them from observation."

| | |
|---|---|
| April 2015 | Three and one half years after purchase and 2 years after the test remediation of the 34 units, Forest City's draft long-range plan for mitigating mold in Keesler AFB housing was finally submitted to base command for review and consideration. Forest City proposed to fix the ductwork in the attics of the houses primarily during change-of-occupancy maintenance (COM), i.e. when the houses were vacant. For the more severe problems (mold that reached down to the first floor), work inside the housing units would be required and the families would be temporarily relocated for 3-5 days to guest houses. Forest City proposed to fix 250 units in 2015, 400 units in 2016, and the remaining 300 units in 2017. |
| April 16, 2015 | Plaintiffs reported that air conditioning unit not cooling. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.** |
| July 29, 2015 | Three years and ten months after purchase, the Air Force approved the above plan. |
| August 26, 2015 | Plaintiffs reported that air conditioning not cooling. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.** |
| December 2015 | Four years and 2 months after purchase Forest City changed Phase 1 of the plan to reduce the number of houses to 144 and was yet to start the mold remediation project. (Hunt – Gen05 - 01416). **Exhibit 19.** |
| December 2, 2015 | Four years and 2 months after purchase a report titled Keesler Air Force Base Enclosure & Moisture Issues Evaluation Report was generated by Building Science Corporation for Hunt Companies (SDT SG-DB LLC 000225). **Exhibit 20.** The emphasis of the investigation was to understand and survey the various moisture and humidity issues occurring in the houses and contained key recommendations for remediation and build back including retrofits to the Building Enclosure and Mechanical Systems along with additional measures to be taken in two years due to the possibility that there will be are outliers (in terms of construction or operation) that will continue to have problems. |
| January 2016 | Four years and three months after purchase Phase I work began. (Hunt – Gen05 - 01416). **Exhibit 19.** |
| February 22, 2016 | Four years and five months after purchase Forest City Realty Trust, Inc. sold its military housing business to Hunt Companies, Inc. resulting in Hunt Southern Group, LLC becoming Owner and Hunt MH Property Management, LLC becoming Agent. |

9

| | |
|---|---|
| May 11, 2016 | Plaintiffs reported termites in the master bath and the upper level stairwell. Maintenance noted that bath room baseboard was rotten from water not termites in their opinion. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.** |
| May 31, 2016 | Four years and eight months after purchase a Notice to Proceed on Phase II covering 844 homes was issued. |
| July 8, 2016 | Plaintiffs reported that air conditioning was not cooling and the the ac was out. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.** |
| July 9, 2016 | Plaintiffs reported that  the air conditioning was not working or coming on again. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.** |
| August 17, 2016 | Plaintiffs reported that hall bath ceiling has suspected substance and check master bath for new termites. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.** |
| September 1, 2016 | Almost five years after purchase, an Internal memorandum from Hunt (Hunt – Gen05 – 01416) summarized the progress of the remediation plan as follows: |
| | Phase 1 scope encompassed 144 units. The subject units were identified as recurring problematic units. The work began in January 2016 and was completed in July 2016. Based on our experience with the 32 test units we estimated that approximately 20% of the Phase 1 units might require additional work. |
| | Phase 2 scope was expected to be applied in the remaining units in Bay Ridge, East and West Falcon and Thrower Park upon completion of the Phase 1 work. The scope would be implemented on units during the change of occupancy turns to minimize interruptions on the residents and was expected to take approximately 40 to 50 months to complete. AFCEC and the base leadership reviewed and approved the Phase 2 scope and plan of attack on May 31, 2016. **Exhibit 19.** |
| December 16, 2016 | Plaintiffs reported that hall bath ceiling has suspected substance. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.** |
| July 7, 2017 | Plaintiffs reported that air conditioning not cooling. Continually getting warmer in the house. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.** |
| August 4, 2017 | Plaintiffs reported that light fixture is hanging from one side and appears to have water in it. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.** |
| August 5, 2017 | Maintenance found subfloor ducts sweating profusely. Kitchen light fixture fell out of the ceiling and water was in the lens. Ceiling has water damage. Access hole cut in ceiling and ac ducts are sweating. Fox-Hunt-Gen01-0001-0006 **Exhibit 24.** |

10

| | |
|---|---|
| September 8, 2017 | Walkthrough for the Moisture Remediation Project was conducted. **Exhibit 21.** |
| October 13, 2017 | Pro-Lab mold test analysis revealed the presence of the following molds in the home: Cladosporium, Curvularia, Other Basidiospores, Penicillium/Aspergillus, Spegazznia. **Exhibit 25.** |
| October 15, 2017 | Plaintiffs moved out due to the conditions existing on the Subject Property. Fox-Hunt-Gen01-000052 **Exhibit 26.** |
| October 16, 2017 | Subsequent to Plaintiffs moving out, Hunt Defendants did the following: The ducts were cleaned, roof vents at the upper roof were replaced, a garage roof leak was repaired, all bathroom exhaust fans were replaced and housing for flappers were checked, all supply registers were removed and cleaned, all areas around the supply register perimeters were cleaned, painted and caulked, the hall bathroom and master bathroom ceilings were cleaned and painted, foam seal was applied to all supply register boots, bathroom exhaust fans and can lights, attic access was sealed and insulated, and the attic fan was reconnected. Front porch soffit was removed, plywood installed under porch, one sheet plywood, one can foam, foam sealed mechanical room return/supply, foam sealed second floor attic supply registers and bathroom fans, sixty-three square feet of vinyl was replaced in the laundry room, cabinets were removed for abatement, ceiling fan, light fixtures, and registers removed for abatement. Byrds installed return in air conditioning unit. **Exhibit 21.** |
| October 30, 2017 | Subsequent to Plaintiffs moving out, Hunt Defendants did the following: Hung drywall in home, finished ductwork, subfloor duct work 100% new, new duct board, new taps and new flex. **Exhibit 21.** |
| November 7, 2017 | Subsequent to Plaintiffs moving out, Hunt Defendants did the following: the ceilings were painted. **Exhibit 21**. |
| November 15, 2017 | Subsequent to Plaintiffs moving out, Hunt Defendants did the following: five bags of insulation were installed, one bath fan was changed, and all fixtures in the home were hung. In general the following areas were addressed in the home: attic penetration sealing, mechanical room ceiling/wall sealing, supply grill in HVAC closet, seal front porch rim joist, outside air system, attic exhaust fan, attic duct condensation, exhaust fan duct connection, seal bathroom exhaust fan from attic and seal attic branches to duct boot. **Exhibit 21.** |

**ARGUMENT**

**EXISTENCE OF THE LATENT DEFECT IS A JUDICIAL ADMISSION**

On February 13, 2015 a Complaint was filed by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC against Hunt Building Company, Ltd., Hunt Yates, LLC, W.G. Yates & Sons Construction Company and others in the in the Circuit Court of Harrison County, Mississippi Second Judicial District. **Exhibit 18.** This lawsuit was referred to by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC as the "latent defect claim" and is an admission by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC that a latent defect in fact existed in all housing on Keesler Air Force Base. Excerpts from Deposition testimony of John Hoyt, Vice President of Development for Forest City Military Communities from 2008 - 2016 and Vice President for Hunt Military Communities from 2016 - present, Exhibit N to be produced under seal. **Exhibit 41.**

This latent defect claim asserted that defects, hidden from view by the fraudulent actions of the defendants, existed in housing on KAFB and that after Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC took over ownership of KAFB housing it begin to receive complaints from residents about water infiltration and indoor air quality issues, that these complaints revealed potential problems with the building design and construction, as well as the performance of the HVAC systems, that an apparent attempt to address the ongoing problems with the structures failed to adequately address the problems, that in an attempt to conclusively establish the cause(s) of the problems reported by the residents Forest City created and implemented a remediation plan on a sample of the 1028 structures which universally revealed "shoddy workmanship" and proceeded to describe the "shoddy workmanship" with a list that detailed no less than ten latent defects derived from the previously listed reports.

This judicial admission by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC contains unequivocal statements describing the hidden defects discovered by them after purchasing the properties as follows: "numerous branch duct and main trunk runs were found to be unsupported and buried below the blown in insulation in order to **fraudulently conceal** the shoddy workmanship" and "the shoddy workmanship was **fraudulently concealed** in a manner intended to prevent discovery" and "Hunt, Hunt Yates, and/or Yates knew or should have known of the existence of these defects prior to covering them with insulation or closing them in inaccessible locations and therefore **fraudulently concealed** them from observation."

In anticipation of Defendants' reply, for Defendants to assert that a latent defect did not exist on the Subject Property after filing a pleading with the Circuit Court of Harrison County, Mississippi stating otherwise would be an inconsistent position subject to the equitable doctrine of judicial estoppel. Judicial estoppel "is an equitable doctrine invoked by a court at its discretion" for the purpose of "protect[ing] the integrity of the judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 749–50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal quotation marks omitted). Judicial estoppel is applied to protect the integrity of the judicial process by preventing parties from "playing fast and loose with the courts" to gain an advantage and lessening the risk of inconsistent or inequitable court determinations. *Howard v. Fina Oil & Chem. Co.*, Civil No. 1:15-cv-48-HSO-JCG (S.D. Miss. 2016).

## NEGLIGENCE STANDARD

The Fifth Circuit has held that expert testimony is required to prove that a toxic substance caused a specific physical injury. See *Washington v. Armstrong World Industries, Inc.*, 839 F.2d 1121, 1123-24 (5th Cir. 1988). In a toxic mold case, a plaintiff must demonstrate by a reasonable medical probability through expert testimony that his alleged injuries were caused by mold

exposure. *Shed v. Johnny Coleman Builders, Inc.*, Civil Action No. 3:16CV171-NBB-RP (N.D. Miss. 2017). General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury. Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence. Thus, there is a two-step process in examining the admissibility of causation evidence in toxic tort cases. First, the district court must determine whether there is general causation. Second, if it concludes that there is admissible general-causation evidence, the district court must determine whether there is admissible specific-causation evidence. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347 (5th Cir. 2007).

## DUTY

Duty is a separate, material element of every negligence claim; it should not be effectively removed as an element by merging it with the broad terms of negligence, causation and liability as Defendants have done in their motion. It is apparent that duty and causation are separate and distinct elements of negligence and negligence-like actions. *Foster v. Bass*, 575 So.2d 967, 972 (Miss. 1990). Mississippi has held that the existence of a duty is a question of law to be decided by the trial court. *Foster v. Bass*, 575 So.2d 967, 972–73 (Miss. 1990); *Ready v. RWI Transp., LLC*, 203 So.3d 590 (Miss. 2016). This is a standard landlord/tenant negligence action. It is well settled in Mississippi that a landlord owes his tenants a duty to keep the premises in a reasonably safe condition. *Minor Child ex rel. John Doe v. Federation*, 941 So.2d 820 (Miss. App. 2006). It is this duty that applies to Defendants and it is this duty which Defendants breached.

Mississippi has never held that an expert is necessary to delineate a different duty of care in a landlord/tenant case just because personal injury is alleged to have occurred due to mold exposure. To the contrary, Mississippi has held that the standard for an implied warranty of habitability should require a landlord to provide a reasonably safe premise at the inception of a lease, and to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by the tenant, unless expressly waived by the tenant. *O'Cain v. Harvey Freeman and Sons, Inc. of Mississippi*, 603 So.2d 824, 833 (Miss. 1991) (Roy Noble Lee, Prather, Robertson, and Banks also concurred, thus giving the opinion precedential value). An expert opinion on the duty element of negligence is not required. Issues of material fact preventing summary judgment exist with regard to whether Defendants provided a reasonably safe home to Plaintiffs and whether Defendants repaired the dangerous defective conditions which existed in the homes created by mold and moisture after being repeatedly notified by Plaintiffs as evidenced in the recitation of facts herein.

## CAUSATION

Plaintiffs' causation expert, Dr. Paul Goldstein, will testify to the following opinions supported by scientific data as set forth in his reports **(Exhibit 27)** and deposition **(Exhibit 28)**:

1. If you can see mold or smell mold you have been exposed. **Exhibit 28 at 134**.
2. The presence of mold in Plaintiffs' home was documented by photographs, Plaintiffs' depositions and mold tests performed by an independent third party. **Throughout Exhibit 28**.
3. Plaintiffs symptoms are documented by their medical records and deposition testimony. **Throughout Exhibit 28**.
4. Any level of mold exposure provides a health risk and is not acceptable. **Exhibit 28 at 134**.
5. According to the World Health Organization (WHO) there are no acceptable levels of mold and therefore no acceptable level of mold exposure so that when there is exposure one must get rid of the mold

because its presence increases their risk for health-adverse effects. **Exhibit 28 at 139.**

6.    Dose-response curves are possible under clinical settings but not in the home environment particularly with molds because it is not possible to know how much mold is in your house unless the entire house is taken apart and inspected. **Exhibit 28 at 141.**

7.    Plaintiffs' home contained filamentous fungi, a class of molds that release mycotoxins. **Exhibit 28 at 145.**

8.    A harmful exposure level is different for each individual because each person reacts to mycotoxins differently. Some people are very sensitive, some are not. Therefore, scientific literature is difficult to come by to establish a specific harmful level. **Exhibit 28 at 142-143.**

9.    The Center for Disease Control (CDC) has documented mycotoxins and problems that people have from exposure to black mold also known as Stachybotrys. The CDC also recognizes that "if you can see or smell mold a health risk may be present." The CDC recognizes that a dose-responsive curve is not possible because "Since the effect of mold on people can vary greatly, either because of the amount or type of mold, you cannot rely on sampling and culturing to know your health risk." **(Exhibit 27).**

10.    Plaintiffs were a cohort who resided in the home and who had symptoms of exposure to mycotoxins. These symptoms could continue past the initial exposure because of the actions of mycotoxin on cells, tissues, DNA, and organs. Although members of the cohort may have had similar symptoms in the past exposure to mycotoxins could exacerbate possible preexisting conditions. **Exhibit 28 at 154.**

11.    The symptoms and problems experienced by Plaintiffs weeks, months and even years later can be related to the damage that could have occurred to their bodies as a result of exposure to mycotoxins. Mycotoxins affect cells. They are cytotoxic. They kill cells. Mycotoxins affect tissues. Mycotoxins affect DNA. Once you affect DNA, proteins are changed. Mycotoxins affect organs. **Exhibit 28 at 164.**

12.    Plaintiffs were exposed to, and suffered from, toxins released by the presence of mold in their home. **Exhibit 28 at 168) and Exhibit 27.**

13.    The occurrence of some, if not all, of the symptoms displayed by Plaintiffs are positively correlated with toxic exposure to the pathogens which were identified in Plaintiffs' residence. This means that there is an association between the symptom and the exposure to the pathogen. **Exhibit 28 at 171, 173 and Exhibit 27.**

14.    Molds are also allergenic, meaning that they can produce an allergic response from individuals. It is not necessary to be hypersensitive to mold only sensitive**. Exhibit 28 at 181.**

15.    Plaintiffs' repeated exposure to mold inside their home constituted chronic exposure.  **Exhibit 28 at 313, 359.**

16.    Other factors that may have caused Plaintiffs' symptoms were considered and ruled out. **Exhibit 28 at 337 and Exhibit 27.**

17.     Dr. Goldstein relied upon 51 percent probability in rendering his opinions, also known as the Bradford Hill Criteria. **Exhibit 28 at 193 and Exhibit 27.**

The evidence, consisting of maintenance reports **(Exhibits 17 and 24)**, photographs **(Exhibit 29)**, deposition testimony **(Exhibit 30 and Exhibit 31)**, and mold tests **(Exhibit 25)** establishes that mold levels inside Plaintiffs' home resulted in toxic exposure to Plaintiffs. There is no evidence in the record to the contrary. This evidence is to be believed, and all justifiable inferences must be drawn in Plaintiffs' favor. Defendants assert that absent identifiable thresholds, the jury will be asked to rely upon Plaintiffs' experts' words alone on what constitutes a dangerous level of mold in Plaintiffs' residence. Not only is this argument wrong but it was rejected in *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999). There, the defendant sought to exclude the testimony of plaintiff's expert concerning the effects of talc on the sinuses because "he had no means of accurately assessing what level of exposure was adequate" to produce ill health effects. Id. at 263. The Fourth Circuit reasoned that:

> [o]nly rarely are humans exposed to chemicals in a manner that permits a quantitative determination of adverse outcomes . . . . Human exposure occurs most frequently in occupational settings where workers are exposed to industrial chemicals like lead or asbestos; however, even under these circumstances, it is usually difficult, if not impossible, to quantify the amount of exposure.

178 F.3d at 264 (citing Federal Judicial Center, *Reference Manual on Scientific Evidence* 187 (1994)). Thus, the court determined that while knowing the specific exposure levels necessary to cause human harm might be beneficial, it is not always necessary where there is "substantial exposure."

The standard is visible mold. Plaintiffs' expert, as stated above, along with Defendants' experts agree with this fact. See Deposition of Rimkus Consulting Group, Inc./Jeff Cook who testified not only that a visual inspection is necessary to determine whether mold is hazardous but also to determine whether a property is habitable. **Exhibit 32 at 73-78.** Defendants' own

documentation states that the presence of visible mold, along with excessive moisture, is sufficient to conclude that a dangerous level of mold growth exists. Defendants repeatedly adopted the "see it smell it" test in their own literature. Defendants admitted to the importance of a visual inspection in their Mold Management Plan wherein it is stated that "The visual assessment is the primary method in the evaluation of mold growth." **Exhibit 33.** The Mold Brochure made available to Plaintiffs by Defendants instructed residents that in order to "discover if I have a mold problem in my house" the resident should: Look around! The most practical way to find a mold problem is by using your eyes to look for mold growth and by using your nose to locate the source of suspicious odors." **Exhibit 34.**

Additionally, the World Health Organization's ("WHO") Guidelines for Indoor Air Quality: Dampness and Mould (2009), which was relied upon by Defendants' experts, states in part that "occupants of damp or mouldy building . . . are at increased risk of respiratory symptoms . . . ." Id. at xiii. It further notes that "[i]ndicators of dampness and microbial growth include the presence of . . . visible mould," and proceeds to recommend remedial measures when dampness and mold problems are identified. **Exhibit 35.** The WHO publication also established guidelines prefaced by the fact that indicators of dampness and microbial growth include the presence of condensation on surfaces or in structures, visible mould, perceived mould odour and a history of water damage, leakage or penetration. The WHO guidelines include the directive that inspections can be used to confirm indoor moisture and microbial growth, that persistent dampness and microbial growth on interior surfaces and in building structures should be avoided or minimized as they may lead to adverse health effects, and that building owners are responsible for providing a healthy living environment that is free of excess moisture and mould, by ensuring proper building construction and maintenance. Id. at Section 5.3. The opinion of the

Environmental Protection Agency, a resource also relied upon by Defendants' experts, is that a sampling cannot be used to assess whether a building complies with federal standards, since no EPA or other federal standards have been established for mold spores and sampling would only produce results reflecting a specific moment in time in the best case and could produce inaccurate or misleading results in the worst case. **Exhibit 36**.

These organizations are charged with setting standards for public health—not aesthetics. If the presence of visible mold suggests remediation under both WHO and EPA guidance, it stands to reason that visible mold presents a health concern and it is clear that there is a consensus among various governmental and other standard setting agencies that visible mold is a danger to human health. Because Plaintiffs will present evidence that they were exposed to visible mold, they can sufficiently show "substantial exposure" and need not present evidence of specific exposure levels or threshold limit values. *Westberry*, 178 F.3d at 264. These facts are not in dispute.

As pointed out by Dr. Goldstein, the Mississippi State Department of Health is in agreement. **Exhibit 37, Exhibit 27, Exhibit 28.** When answering the question, "How much mold can make me sick?", the State responds as follows:

> It depends. For some people, a relatively small number of mold spores can cause health problems. For other people, it may take many more. The basic rule is, if you can see or smell it, take steps to eliminate the excess moisture, and to cleanup and remove the mold.

Plaintiffs testified that they saw mold in the kids' bathroom, the vent above the stove, the kitchen, the pantry, the dining room, the upstairs closet, the air-conditioner in the laundry room, a plug in the hallway, in the living room, in the attic, under the sink, in the garage, in the master bath, in the linen closet, in their daughter's bedroom, in the boys' bedroom and that the entire

house had a dank smell. **Exhibit 30 Vol II at 23, 34, 40, 48, 60, 63, 70, 71, 78, 81, 85, 86, 88, 90. Exhibit 31 Vol I at 117, 123, 131, 135, 145, 146, 155, 158, 178, 262, Vol. II at 432, 434.**

Plaintiff Christopher Fox testified that he suffered from the following symptoms while living in the house and being exposed to mold: flu like symptoms, headache, sore throat, dizziness, breathing problems, nasal congestion, watery eyes, shortness of breath and mononucleosis. Exhibit 30 Vol. II at 160, 172, 253. Plaintiff Karen Fox testified that she suffered from the following symptoms while living in the house and being exposed to mold: runny nose, felt sick all the time, colds, fever and headaches. **Exhibit 31 Vol. I at 346 and 350.** Plaintiff Makaila Fox: headaches. **Exhibit 31 Vol. II at 494 and 499.** Plaintiff Haley Fox: constant upper respiratory issues, colds, runny nose, runny eyes, wheezing, cough, phlegm and pinkeye. **Exhibit 31 Vol. II at 504, 505 and 510.** Christopher Fox: colds, runny nose, coughing, phlegm, worsening of asthma, shortness of breath and wheezing. **Exhibit 31 Vol. II at 517, 518, 519.** Tristan Fox: lingering cough, itchy throat, cold, tiredness. **Exhibit 31 Vol. II at 530.** Easton Fox: sore throat and colds. **Exhibit 31 Vol. II at 536.**

The reliability of a specific causation opinion requires the proffered expert to consider and rule out other likely causes of a plaintiff's alleged ailments - in other words, the expert must perform, and the plaintiff must present to the court, a proper differential diagnosis. *Shed v. Johnny Coleman Builders, Inc.*, Civil Action No. 3:16CV171-NBB-RP (N.D. Miss. 2017). A differential diagnosis "is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry*, 178 F.3d at 262. A medical expert's opinion based upon differential diagnosis normally should not be excluded because the expert has failed to rule out every possible alternative cause of a plaintiff's illness. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001). Dr. Goldstein ruled

out other causes as set forth above and had Plaintiffs complete a toxic substance exposure questionnaire which allowed him to disavow any other potential causes of Plaintiffs' symptoms. **Exhibit 27.**

Dr. Goldstein's opinions on causation should not be discredited simply because he is a toxicologist and not a medical doctor. An expert who is not a medical doctor may be qualified to give medical causation testimony. Federal appellate courts have held that toxicologists may be qualified to give medical causation testimony. In *Paoli R.R. v. Monsanto Co.*, 916 F.2d 829 (3d Cir. 1990), the Third Circuit found that the district court abused its discretion in concluding that a toxicologist could not testify that PCBs caused the plaintiffs injuries stating that the language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of "knowledge, skill, experience, training, or education" . . . qualify an expert as such. 916 F. 2d at 855. In *Genty v. Resolution Trust Corp.*, 937 F.2d 899 (3d Cir. 1991), the court likewise concluded that a toxicologist could testify that plaintiffs' illnesses could have resulted from substances emanating from a landfill. The court held that "[m]edical doctors . . . are not the only experts qualified to render an opinion as to the harm caused by exposure to toxic chemicals." Id. at 917. The Eight Circuit has reached similar conclusions. See *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 928-31 (8th Cir. 2001) and *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 569-70 (8th Cir. 1988).

## CIVIL CONSPIRACY

Plaintiffs assert that Defendants operated under an agreement to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property and that each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs. The elements of a civil conspiracy are: (1) two or more persons or

corporations; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result. *Gallagher Bassett Servs. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004). The fourth element of a civil conspiracy - an unlawful overt act - may be based on any tort and need not be an intentional tort. See *Aiken v. Rimkus Consulting Group, Inc.*, 333 F. App'x 806, 812 (5th Cir. 2009); *Wells v. Shelter Gen. Ins. Co.*, 217 F. Supp. 2d 744, 755 (S.D. Miss. 2002). Plaintiffs' claims of negligence and breach of contract in all of their different variations are sufficient.

Plaintiffs have alleged sufficient facts to state a plausible claim of civil conspiracy. Specifically, discovery has revealed that Defendants maintained their cloak of secrecy throughout their periods of ownership of housing at KAFB. Keep in mind that although the management company may have changed in February of 2016, the identity of the owner changed in name only. What was once Forest City Southern Group, LLC became Hunt Southern Group, LLC after a name change. The evidence establishes that the employees stayed the same, their leasing documents stayed the same, they continued to operate under the same agreements with the United States of America and their pattern of non-disclosure when it came to what Plaintiffs needed to know remained the same. **Exhibit 39, Exhibit 40, Exhibit 41.**

Defendants conspired to keep the magnitude of the mold and moisture problem from Plaintiffs. The existence of the known latent defect was not disclosed to Plaintiffs in the leasing package. As part of the leasing package evidenced by the Paperwork Checklist, residents were given a Community Handbook that did not mention the world "mold" and a Mold Addendum that instructed residents what to do "if" they found mold in their home. See excerpts from deposition of Cindy Ritenour, employed by Forest City Residential Management since 1990 and currently serving as Vice President of Administration, **Exhibit 38.** See also excerpts from

individual deposition of Freddie James, Resident Service Specialist and Assistant Manager for Forest City Residential Management from 2013– 2014 and current Community Director for Hunt MH Property Management, LLC from 216 – present, **Exhibit 39.** The Mold Addendum, the same exact form used by all Defendants, does not disclose the known latent defect. **Exhibit 38 and Exhibit 39.**    The maintenance records for the Subject Property for the time prior to Plaintiffs' lease were not disclosed to Plaintiffs and in furtherance of the conspiracy, Defendants' attorneys refused to produce them in discovery until the Court ordered them to do so. See Order Granting in Part Motions to Compel (Document 191). Neither Forest City Residential Management LLC nor Hunt MH Property Management LLC disclosed to residents during the leasing process that there was a known moisture and mold problem in housing. See excerpts from deposition of Mary Ranson, Assistant General Manager of Forest City Southern Group from 2012 – 2013, General Manager of Forest City Southern Group from 2013 – 2016 and current director of Operations for Hunt Military Housing from 2016 – present, **Exhibit 40.**

Plaintiffs have suffered a variety of damages as a result of Defendants' actions. The deposition testimony of Plaintiffs discusses in detail the adverse health effects suffered by each family member, both physical and mental, expenses incurred and property lost. Deposition transcripts attached as **Exhibit 30 and Exhibit 31.** Construing these allegations in the light most favorable to Plaintiffs, they are sufficient to state a claim of civil conspiracy. *Holloway v. Lamar Cnty*, Civil Action No. 2:15-CV-86-KS-MTP (S.D. Miss., 2015).

### BREACH OF THE IMPLIED WARRANTY OF HABITABILITY

Plaintiffs allege in their Amended Complaint (Document 203) that Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they provided a house that was not fit for human habitation.  Implied warranties are those promises

not explicitly made by contract, but are nonetheless enforced by courts. *Black's Law Dictionary* (10th ed. 2014). Implied warranties arise by operation of law because of the circumstances of the lease rather than by the lessor's express promise.

The implied warranty of habitability was first recognized by Justice Sullivan's concurrence, joined by a majority of the Mississippi Supreme Court, in the case of *O'Cain v. Harvey Freeman and Sons*, 603 So.2d 824 (Miss.1991). In that concurrence, Justice Sullivan, relying heavily on the provisions of the Residential Landlord and Tenant Act, Section 89-8-1, et seq., Mississippi Code of 1972, wrote that the landlord tenant relationship itself gives rise to an implied warranty of habitability that, as a "bare minimum ... should require a landlord to provide reasonably safe premises at the inception of a lease...." Id. at 833. Despite the fact that this warranty would seem to suggest a cause of action sounding in contract, Justice Sullivan's concurrence specifically held that the "[b]reach of the duty to use reasonable care to provide safe premises would entitle the tenant to pursue contract remedies as well as tort." Id.

Any doubt as to the precedential value of Justice Sullivan's concurrence was answered by the Mississippi Supreme Court in the case of *Sweatt v. Murphy*, which acknowledged that four Justices besides Justice Sullivan joined the concurrence, and which also observed that "[t]he implied warranty of habitability is based upon sound considerations of public policy...." *Sweatt v. Murphy*, 733 So.2d 207 (¶ 9) (Miss.1999).

It has already been established that the existence of a latent defect was judicially admitted by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC. **Exhibit 18.** Whether Plaintiffs' home was habitable is a question for the trier of fact. The jury will listen to Plaintiffs describe the defective condition of their military housing, the recurrent mold infestation, their repeated yet unsuccessful efforts to get Defendants to fix the defect and will

look at the repulsive photographs of mold throughout Plaintiffs' home. The jury will also consider the volumes of maintenance records kept by Defendants which prove that moisture and mold was a problem in Plaintiffs' residence before they ever moved in. **Exhibit 17, Exhibit 24, Exhibit 29, Exhibit 30, Exhibit 31**. The jury will then decide. It is not within the province of Defendants to make this determination.

Plaintiffs' claim for breach of the implied warranty of habitability, along with all contract claims asserted by Plaintiffs, apply to all Defendants, not just the defendant who appears on paper to be the owner/landlord of the property, which is why Plaintiffs asserted an alter ego liability claim in their Amended Complaint (Document 203). Despite the fact that a sale took place in 2016, very little changed. The employees stayed the same, the documents stayed the same, the contractual obligations remained the same, the same offices were maintained, the maintenance software remained the same, and employees and corporate officers were unable to identify in depositions who their actual employers were.

Defendants could not even get it right in their own operating documents. Although both management companies, Forest City Residential Management, LLC and Hunt MH Property Management, LLC represented to the court in their motions that they acted throughout the time in question as an agent of the owner, their relationship is described in the Property Management Agreement, Section 9.3, as an independent contractor." **Exhibit 5.** Which is it? Plaintiffs' guess is that Defendants will choose whichever is more convenient to the argument they are making at the time.

**SCRA AND CONSTRUCTIVE EVICTION**

One of the purposes of the Servicemembers Civil Relief Act (SCRA) is "to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service." 50 USC App 502(2). See also *Walters v Nadell*, 481 Mich 377, 386 (2008) ("Congress enacted the SCRA as a shield to protect servicemembers from having to respond to litigation while in active service"). "[The SCRA] is always to be liberally construed to protect [servicemembers.]" *Boone v Lightner*, 319 US 561, 575 (1943) (referring to the Soldiers' and Sailors' Civil Relief Act, the predecessor to the SCRA).Title III of the SCRA, 50 USC App 531–50 USC App 538, provides protection for servicemembers and their dependents when a servicemember's military service has a material effect on the servicemember's or his or her dependents' ability to meet obligations in the areas covered by the SCRA. 50 USC App 531; 50 USC App 535.

Consistent with Mississippi law, the SCRA protects a servicemember and his or her dependents from eviction without a court order. 50 USC App 531(a)(1)(A). This protection from eviction applies during a period of the servicemember's military service, when the premises are occupied or are intended to be occupied "primarily as a residence" and when the monthly rent for the premises does not exceed $3,851.03 for 2019 (as adjusted each calendar year for price inflation).29 50 USC App 531(a)(1)(A). See also 50 USC App 531(a)(2)(A).

A violation of 50 USC App 531 is a Class A misdemeanor. 50 USC App 531(c). See also 18 USC 3559(a)(6); 18 USC 3581(b)(6). "Except as provided in subsection (a) [(eviction guidelines)], a person who knowingly takes part in an eviction or distress . . . , or who knowingly attempts to do so, shall be fined as provided in [18 USC 357131], or imprisoned for not more than one year, or both." 50 USC App 531(c). A person aggrieved by a violation of the SCRA has a private right of action against the person responsible for the violation. 50 USC App 597a(a). A

person who prevails in an action under 50 USC App 597a may be awarded "any appropriate equitable or declaratory relief with respect to the violation" and "all other appropriate relief, including monetary damages." 50 USC App 597a(a)(1)-(2). The court may also award costs and a reasonable attorney fee to the aggrieved person if he or she prevails in the action. 50 USC App 597a(b). Under certain circumstances, the United States Attorney General may also enforce the SCRA's provisions through civil actions against persons who violate the Act. See 50 USC App 597.

As set forth in *Perkins v. Blackledge*, 285 So.2d 761 (Miss. 1973), Mississippi has adopted the following definition of constructive eviction:

> 52 C.J.S. Landlord and Tenant § 455 (1968) has this to say about constructive eviction:
>
> An intentional act or omission of the landlord, or by those acting under his authority or with his permission, that permanently deprives the tenant without his consent of the use and beneficial enjoyment of the demised premises or any substantial part thereof, in consequence of which he abandons the premises, constitutes a constructive eviction. However, not every deprivation of the beneficial enjoyment of the premises necessarily amounts to a constructive eviction, and it is necessary that the landlord, by some intentional act or omission, materially and permanently interfere with the beneficial enjoyment or use of the demised premises or a material part thereof, and that, in consequence of such act or omission, the tenant abandon the premises within a reasonable time, as discussed infra § 457. Furthermore, there must be an injurious interference by the landlord, depriving the tenant of the beneficial enjoyment of the premises, or materially impairing such beneficial enjoyment. In other words, the landlord's interference with the tenant's use and enjoyment must be substantial and effectual, material, fundamental, permanent, and intentional, . . . The act or omission complained of must be that of the landlord, and be one done by his procurement, or one for which he is responsible, and not merely that of a third person acting without his authority or permission, . . . 52 C.J.S. at pages 303-305.

It has already been established that the existence of a latent defect was judicially admitted by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC. **Exhibit 18.** Whether Plaintiffs were constructively evicted from their home because it was uninhabitable is

also a question for the jury. The testimony of Plaintiffs, the photographs of the mold in Plaintiffs'

homes, the pages of Defendants own maintenance records showing one failure after another and

therefore evidencing their inability to cure the defects, will all be placed into evidence for the

trier of fact to consider. **Exhibit 17, Exhibit 24, Exhibit 29, Exhibit 30, Exhibit 31.** The jury

will determine whether Plaintiffs were deprived of the use and beneficial enjoyment of the

demised premises resulting in its abandonment and whether this deprivation was the result of

intentional act or omission, or both, of Defendants. Although Mississippi courts haven't

expressly held so, multiple jurisdictions have held that whether a constructive eviction has

occurred is a question of fact for the trier of fact. See *West Broadway Glass Co. v. I.T.M. Bar

Inc.*, 658 N.Y.S.2d 162, 171 Misc.2d 321 (N.Y. App. Term, 1996); *Bowdoin Square, LLC v.

Winn-Dixie Montgomery, Inc.*, 873 So.2d 1091 (Ala., 2003); *Plakhov v. Serova*, 126 So.3d 1221

(Fla. App., 2012); *Hilldale Land Co. v. Harn,* (Wis. App., 2012).

## EMOTIONAL DISTRESS

Variations of emotional distress exists in Mississippi. Emotional distress can be sustained

in the present, in the future, can be intentionally or negligently inflicted and can be based on

contract. Plaintiffs' negligent infliction of emotional distress claims are supported by facts which

cannot be contested by Defendants. Plaintiffs do not need a health expert's testimony but only

evidence of a physical injury. *Coleman v. City of Hattiesburg,* Civil Action No. 2:16-CV-135-

KS-MTP (S.D. Miss. 2018). "Some sort of physical manifestation of injury or demonstrable

physical harm" is necessary for a negligent infliction of emotional distress claim. *Wilson v.

General Motors Acceptance Corp.*, 883 So.2d 56, 65 (2004) (quoting *Am. Bankers' Ins. Co. of

Fla. v. Wells*, 819 So.2d 1196, 1209 (Miss. 2001)).

With regard to emotional distress, Plaintiff Christopher Fox testified that he was frustrated with regard to the mold and the way it was handled by the defendants and the fact that his wife always given the run around by maintenance. **Exhibit 30 Vol II at 56 and 75.** Plaintiff Karen Fox also testified that the repeated mold was frustrating. **Exhibit 31 Vol. II at 150.**

Defendants' actions were also sufficient to support an intentional infliction of emotional distress claim when the holding of *Swarzfager v. Saul*, 213 So. 3d 55 (Miss. 2017) is considered. In that case, the defendant's actions concerning a land sale/swap scheme were described as "'self-serving greed from start to finish' - something akin to 'a portrait of egregious behavior.'" Id. at 67. The acts "were clearly and intentionally made in self-serving bad faith . . . with total disregard for the welfare of [the plaintiffs]." Id. The court found "support for the chancellor's finding that [the defendant's] behavior was repetitive and egregious, resulting in the disruption of [the plaintiffs'] lives, with the sole result being [the defendant's] financial benefit. [The plaintiffs'] emotional distress clearly was a foreseeable result of [the defendant] repeatedly breaking his promises." Id.

Plaintiffs' emotional distress was clearly a foreseeable result of Defendants' repeated fraudulent behavior and repeated breaching if their duty to repair and maintain a safe, habitable premises. Defendants repeatedly misrepresented and failed to disclose to Plaintiffs the true condition of their home in order to financially benefit from Plaintiff's Basic Allowance for Housing (BAH) which was automatically deposited into Defendants' accounts each month. Defendants were slumlords. Turnover in base housing was high, payments were made by BAH with little or no default rate and it was cheaper and easier to pacify than to correct. **Exhibit 40 at 21, 23 and Exhibit 41 at 58, 138.** When a defendant's behavior is repetitive and egregious, resulting in the disruption of a plaintiff's life, with the sole result being the defendant's financial

benefit, the emotional distress is clearly a foreseeable result of the defendant repeatedly breaking its promises and it is proper to find that the defendant's intentional and egregious acts caused the plaintiff's emotional distress. *Swartzfager v. Saul*, 213 So.3d 55, 67 (Miss., 2017). Defendants benefitted financially by their actions. In fact, the terms of FCRM's Property Management Agreement provide that if a systemic problem with mold at certain housing units at KAFB was found to exist the calculation of their Performance Incentive Fee would not be affected, i.e. their fee would be paid in full during the first 2 years of the agreement. **Exhibit 5.** Defendants suffered no financial downside to their fraudulent actions.

Claims of emotional distress based on a future fear of contracting a disease or illness require evidence proving exposure of a plaintiff to a dangerous or harmful agent and medical evidence pointing to possible or probable future illness. *Leaf River Forest Products, Inc. v. Ferguson*, 662 So.2d 648 (Miss., 1995). Plaintiffs will prove at trial through their own testimony and through the testimony of Dr. Goldstein that they were exposed to mold in their military housing on KAFB throughout their residency and that exposure to mycotoxins produced by mold have long-lasting health effects. **Exhibit 28, Exhibit 30, Exhibit 31.**

The Courts have moved away from the physical manifestation requirement for breach of contract claims. *Univ. of S. Miss. v. Williams*, 891 So.2d 160, 172 (¶ 30) (Miss. 2004).  When a claim for emotional distress is based on a contract, a plaintiff must show that (1) the emotional distress was a foreseeable consequence of the particular breach-of-contract and (2) that he or she actually suffered emotional distress; plaintiffs need not prove any physical manifestation. Id. at 172–73 (¶ 31). However, the plaintiff must show specific suffering during a specific time frame and generalizations are not sufficient. Id. As set forth above in great detail, Plaintiffs testified in their depositions that the repeated presence of mold in their home and Defendants' inability to

remove it affected them in multiple ways. **Exhibit 30 and Exhibit 31.** These events certainly would cause a reasonable person great distress. Even if Plaintiffs' suffering and the disruption of their family's life are categorized as mere discomfort, "testimony concerning 'discomforts' ... take[s] on a different importance when viewed in light of the event which engendered the mental anguish." Id. at 173 (¶ 32) (citing *Whitten v. Cox*, 799 So.2d 1, 10–11 (Miss. 2000). See above for a description of the slumlord mentality of Defendants.

### FRAUDULENT CONCEALMENT

Fraudulent concealment has been recognized as a cause of action in Mississippi. *Morgan v. Green-Save, Inc.*, 2 So.3d 648 (Miss. App., 2008). In the context of fraudulent concealment, either an omission or a concealment of a material fact can constitute fraud. *Rankin v. Brokman*, 502 So.2d 644, 646 (Miss.1987) (quoting *Davidson v. Rogers*, 431 So.2d 483, 485 (Miss.1983)). However, in order to create liability for nondisclosure, the defendant's "silence must relate to a material fact or matter known to the party and as to which it is his legal duty to communicate to the other contracting party." *Mabus v. St. James Episcopal Church*, 884 So.2d 747 at 762-63 (Miss. 2004) (citing *Guastella v. Wardell*, 198 So.2d 227, 230 (Miss.1967). In the absence of a fiduciary relationship, some other legal duty must be apparent from the record. *Mabus v. St. James Episcopal Church*, 13 So. 3d 260, 265 (Miss. 2009). Defendants had a duty to disclose known latent defects to Plaintiffs and did not do so. A landlord is liable for injuries incurred as a result of dangers, which usually are latent, which he knows about and conceals, or, being aware of same, does not inform the tenant. *Loflin v. Thornton*, 394 So.2d 905 (Miss., 1981) In other words, Defendants fraudulently concealed the known latent defect from Plaintiffs.

Defendant Hunt Southern Group, LLC fka Forest City Southern Group, LLC admitted to the existence of latent defects in their 2015 lawsuit against Hunt, asserted several times

throughout the complaint that these defects were hidden by the fraudulent activities of Hunt, and then engaged in its own pattern of fraudulent concealment/non-disclosure after the 2016 sale by continuing to hide the latent defects from Plaintiffs. **Exhibit 18 and Exhibit 23.** Issues of material fact preventing summary judgment exist with regard to whether Defendants fraudulently concealed from Plaintiffs the hidden dangerous defective conditions which existed in their home created by mold and moisture as evidenced in the recitation of facts herein.

### THIRD PARTY BENEFICIARY

To be a third-party beneficiary, the rights of the third-party must spring forth from the terms of the contract itself. *Ground Control, LLC v. Capsco Indus., Inc.*, 214 So. 3d 232, 242 (Miss. 2017) (citing *Trammell v. State*, 622 So. 2d 1257, 1260 (Miss. 1993)). The Mississippi Supreme Court has held that a person or entity may be considered a third-party beneficiary if: (1) the contract between the original parties was entered for that person's or entity's benefit, or the original parties at least contemplated such benefit as a direct result of performance; (2) the promisee owed a legal obligation or duty to that person or entity; and (3) the legal obligation or duty connects that person or entity with the contract. *S. Indus. Contractors, LLC v. Neel-Schaffer, Inc.*, Cause No. 1:17CV255-LG-JCG (S.D. Miss. 2017).

As previously documented, in September of 2011 Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC purchased the KAFB housing from the United States of America Division of the Air Force. What Plaintiffs knew at the time their Amended Complaint was filed was that the purchase included an Environmental Management Plan which was incorporated into the Project Operating Agreement and which described "the procedures to be implemented by Forest City Southern Group, LLC ("FCSG") to ensure environmental protection during property management activities at Keesler Air Force Base housing communities."

32

Plaintiffs did not know that another document, the Master Development and Management Agreement, also existed but was being withheld by Defendants until they determined its benefits outweighed its risks and produced it, after expiration of the discovery deadline, in support of their motions for summary judgment because it contains a disclaimer with regard to third party beneficiaries. **Exhibit 4.**

This Environmental Management Plan specifically recognized that "The presence of mold and fungus in occupied buildings may be a health risk under certain circumstances. Response to mold toxins varies by individual, but those most likely to be sensitive to mold exposures include infants and children, the elderly, and those patients whose immune system has been compromised."

In accordance with the Environmental Management Plan Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC contracted as follows:

> Family Housing will be managed to prevent the occurrence of mold and fungus in occupied areas. If mold is identified, it will be abated as soon as practical. Abatement will comply with any applicable local, state, or Federal regulations in place at the time of abatement. FCSG understands that some units currently have a potential mold issue and will endeavor to continue to cooperate with the AF in its analysis and cleaning initiatives.

> The best management approach is to ensure that mold growth does not occur. This approach requires an aggressive response to water leaks and moisture intrusion. Where porous building materials have become wet, the materials will either be immediately dried out or removed. Since mold growth can commence within several days in a favorable environment, immediate removal of the source of moisture supporting the growth of mold and fungus is critical.

> In addition to promptly responding to residents' reports of mold and abating as necessary, FCSG will inspect each housing unit and ventilation system for mold and dampness upon each change of occupancy. Any mold will be abated, and any areas noted to offer a likely growth place for mold will be cleaned and thoroughly dried.

> Air monitoring for mold is not typically conducted, because a visual inspection usually provides adequate information for abatement. Also, some air monitoring

methods are prone to "false negative" results and cannot be used to rule out the presence of mold.

Plaintiffs third party beneficiary claims are based not only upon the Environmental Management Plan as Defendants would have this court believe, but also upon the Property Management Agreement between Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC and Defendant Forest City Residential Management, Inc. wherein Defendant Forest City Residential Management, Inc. was contractually obligated, among other things, to make arrangements for water, sewer, electricity, gas, sewage service, and for trash disposal and vermin extermination for Plaintiffs (Section 4.2.7), to perform all routine yard maintenance and interior and exterior cleaning necessary to maintain the Property in habitable and lawful condition (Section 7.1.1),  agreed not to discriminate against Plaintiffs on the grounds of race, color, sex, creed or national origin, including Title VI of the Civil Rights Act of 1964 (Section 4.4), and agreed to maintain the Subject Property in good repair (Section 6.1). Defendant Forest City Residential Management, Inc.'s obligations were assumed by Defendant Hunt MH Property Management, LLC. **Exhibit 5.**

The reproduced language found within both agreements prove that the agreements were entered for the benefit of Plaintiffs or at a minimum each original party at least contemplated such a benefit as a direct result of performance, i.e. such is the nature of each agreement. The contracting parties owed a legal obligation or duty to Plaintiffs as they stood in the position of either the property owner or property manager; and this legal obligation or duty connects Plaintiffs with both contractual agreements.

**CONCLUSION**

Defendants have thrown mounds of evidence at the Court in an attempt to distract the Court from their own actions and have failed to prove that they are entitled to the relief they seek as a matter of law. At best, they have created issues of fact. Their motion must be denied.

WHEREFORE, Plaintiffs pray that the Hunt Defendants' Motion for Summary Judgment be denied.

Respectfully submitted this 20th day of June, 2019.

RUSHING & GUICE, P.L.L.C.

Attorneys for Plaintiffs

By:     */s/ Maria Martinez*
        MARIA MARTINEZ MSBN 9951
        WILLIAM LEE GUICE III MSBN 5059
        R. SCOTT WELLS MSBN 9456
        P.O. BOX 1925
        BILOXI, MS 39533
        Voice: (228) 374-2313 Fax: (228) 875-5987
        mmartinez@rushingguice.com
        bguice@rushingguice.com
        swells@rushingguice.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this 20th day of June, 2019, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all known counsel of record by operation of the court's electronic filing system.

        */s/ Maria Martinez*
        MARIA MARTINEZ

W:\!MOLD-MM ONLY\!Responses to Summary Judgment Motions\Fox\19-0619 Official Response Hunt - Fox.docx